**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| Jeffrey Thomas, Jr., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:22-cv-427 |
| | ) | |
| Susan Beals, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE AMENDED COMPLAINT UNDER**
**FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**

Jason S. Miyares
 *Attorney General*

Charles H. Slemp III (VSB #79742)
 *Chief Deputy Attorney General*

Steven G. Popps (VSB #80817)
 *Deputy Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704 – Telephone
(804) 371-0200 – Facsimile
AFerguson@oag.state.va.us

Andrew N. Ferguson (VSB #86583)
 *Solicitor General*

Erika L. Maley (VSB #97533)
 *Principal Deputy Solicitor General*

Kevin M. Gallagher (VSB #87548)
Graham K. Bryant (VSB #90592)
 *Deputy Solicitors General*

Rohiniyurie Tashima (VSB #97248)
 *John Marshall Fellow*

*Counsel for Defendants Susan Beals, Robert*
*Brink, and Virginia Department of Elections*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 2

   I.   Virginia's redistricting process and the 2021 general election ............................ 2

   II.  Plaintiffs' involvement in Paul Goldman's lawsuit ........................................... 3

   III. Plaintiffs' lawsuit .............................................................................................. 6

LEGAL STANDARD ............................................................................................................. 7

ARGUMENT .......................................................................................................................... 8

   I.   This Court lacks subject-matter jurisdiction over Plaintiffs' claims ................. 8

      A.  Plaintiffs lack standing because they do not seek a remedy that can redress their alleged injury ........................................................................................... 8

      B.  Plaintiffs' claims are barred by sovereign immunity .................................. 12

   II.  Plaintiffs fail to state claims upon which relief can be granted ....................... 18

      A.  The Fourteenth Amendment does not require a State to reapportion its legislative districts before new census data are available ........................... 18

      B.  Plaintiffs fail to state a viable Voting Rights Act claim ............................. 24

      C.  Laches bars Plaintiffs' claims for injunctive relief .................................... 28

      D.  Constitutional and prudential principles foreclose Plaintiffs' relief ........... 33

         1.   *Purcell* bars equitable relief this close to an election ................... 33

         2.   The "unclean hands" doctrine is irrelevant to this case ............... 36

         3.   Prudential principles governing the special-election remedy foreclose Plaintiffs' requested relief ............................................ 40

CONCLUSION ..................................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018) ................................................................................................ 26

*Allen v. Cooper*,
    895 F.3d 337 (4th Cir. 2018) ..................................................................................... 16

*Allen v. Wright*,
    468 U.S. 737 (1984) ..................................................................................................... 27

*Andino v. Middleton*,
    141 S. Ct. 9 (2020) ....................................................................................................... 34

*Antrican v. Odom*,
    290 F.3d 178 (4th Cir. 2002) ..................................................................................... 14

*Ardoin v. Robinson*,
    --- S. Ct. ---, 2022 WL 2312680 (June 28, 2022) .................................................... 35

*Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*,
    --- F. Supp. 3d ---, 2022 WL 496908 (E.D. Ark. Feb. 17, 2022) ........................... 25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................................................... 8

*Baker v. Carr*,
    369 U.S. 186 (1962) ..................................................................................................... 20

*Bein v. Heath*,
    47 U.S. 228 (1848) ....................................................................................................... 38

*Bethune-Hill v. Virginia State Bd. of Elections*,
    368 F. Supp. 3d 872 (E.D. Va. 2019) .............................................................. 3, 27

*Biggs v. North Carolina Dep't of Pub. Safety*,
    953 F.3d 236 (4th Cir. 2020) ..................................................................................... 14

*Billups v. United States*,
    433 F. Supp. 3d 916 (E.D. Va. 2020) ......................................................................... 7

*Bonilla v. City Council of City of Chicago*,
    809 F. Supp. 590 (N.D. Ill. 1992) ............................................................................. 23

*Booth v. State of Maryland*,
    112 F.3d 139 (4th Cir. 1997) ..................................................................................... 14

*Bragg v. West Va. Coal Ass'n,*
  248 F.3d 275 (4th Cir. 2001) .......................................................................... 15

*Brnovich v. Democratic Nat'l Comm'n,*
  141 S. Ct. 2321 (2021)............................................................................. 25, 26

*Brown v. Thomson,*
  462 U.S. 835 (1983).......................................................................................... 19

*Bryant v. Lawrence Cnty.,*
  814 F. Supp. 1346 (S.D. Miss. 1993)................................................................ 22

*Cash v. Granville Cnty. Bd. of Educ.,*
  242 F.3d 219 (4th Cir. 2001) .......................................................................... 13

*Chien v. Grogan,*
  2017 WL 1091504 (E.D. Va. Mar. 23, 2017) ................................................. 13

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983)............................................................................................ 10

*Clark v. Marx,*
  2012 WL 41926 (W.D. La. Jan. 9, 2012) ......................................................... 22

*Clarno v. People Not Politicians,*
  141 S. Ct. 206 (2020)........................................................................................ 34

*Clements v. Fashing,*
  457 U.S. 957 (1982).......................................................................................... 30

*Cosner v. Dalton,*
  522 F. Supp. 350 (E.D. Va. 1981) ................................................................ 9, 10

*Crookston v. Johnson,*
  841 F.3d 396 (6th Cir. 2016) .......................................................................... 36

*Curtin v. Virginia State Bd. of Elections,*
  463 F. Supp. 3d 653 (E.D. Va. 2020) .................................................. 29, 31, 33

*DeBauche v. Trani,*
  191 F.3d 499 (4th Cir. 1999) ..................................................................... 14, 16

*Democratic Nat'l Comm. v. Wisconsin State Legis.,*
  141 S. Ct. 28 (2020)..................................................................................... 33, 34

*Edley-Worford v. Va. Conf. of United Methodist Church,*
  430 F. Supp. 3d 132 (E.D. Va. 2019) ................................................................. 8

*Evenwell v. Abbott,*
578 U.S. 54 (2016) .................................................................................... 19

*Ex parte Young,*
209 U.S. 123 (1908) ............................................................................. passim

*Fairley v. Forrest Cnty.,*
814 F. Supp. 1327 (S.D. Miss. 1993) ....................................................... 22

*Farnum v. Burns,*
548 F. Supp. 769 (D.R.I. 1982) ................................................................ 21

*Flateau v. Anderson,*
537 F. Supp. 257 (S.D.N.Y. 1982) ........................................................... 21

*Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.,*
202 F.3d 223 (4th Cir. 2000) .................................................................... 39

*French v. Boner,*
963 F.2d 890 (6th Cir. 1992) .................................................................... 23

*Fulani v. Hogsett,*
917 F.2d 1028 (7th Cir. 1990) .................................................................. 29

*Gaffney v. Cummings,*
412 U.S. 735 (1973) .................................................................................. 19

*Gaona v. Anderson,*
989 F.2d 299 (9th Cir. 1993) .............................................................. 22, 28

*Garcia v. 2011 Legislative Reapportionment Comm'n,*
938 F. Supp. 2d 542 (E.D. Pa. 2013) ....................................................... 22

*Garey v. James S. Farrin, P.C.,*
35 F.4th 917 (4th Cir. 2022) ...................................................................... 9

*Georgia v. Ashcroft,*
539 U.S. 461 (2003) .................................................................................. 21

*Giddens v. Isbrandtsen Co.,*
355 F.2d 125 (4th Cir. 1966) .............................................................. 29, 32

*Goldman v. Brink,*
2022 WL 2024745 (E.D. Va. June 6, 2022) ........................................ passim

*Goldman v. Brink,*
2022 WL 794968 (4th Cir. Mar. 15, 2022) ........................................... 5, 38

*Goldman v. Northam*,
  566 F. Supp. 3d 490 (E.D. Va. 2021) .......................................................................... passim

*Graves v. City of Montgomery*,
  807 F. Supp. 1096 (M.D. Ala. 2011) .................................................................................. 22

*Growe v. Emison*,
  507 U.S. 25 (1993) ............................................................................................................. 25

*Hall v. Virginia*,
  385 F.3d 421 (4th Cir. 2004) ........................................................................................ 24, 26

*Hancock Cnty. Bd. of Supervisors v. Ruhr*,
  568 Fed. Appx. 295 (5th Cir. 2014) (per curiam) .......................................................... 11, 12

*Heckler v. Mathews*,
  465 U.S. 728 (1984) ........................................................................................................... 27

*Hoepfl v. Barlow*,
  906 F. Supp. 317 (E.D. Va. 1995) ..................................................................................... 10

*Hutchinson v. Miller*,
  797 F.2d 1279 (4th Cir. 1986) ........................................................................................... 39

*Industrial Servs. Grp., Inc. v. Dobson*,
  2022 WL 2232473 (W.D.N.C. June 21, 2022) ................................................................... 38

*Jafari v. City of Richmond*,
  2006 WL 5444365 (E.D. Va. May 12, 2006) ...................................................................... 25

*Johnson v. De Grandy*,
  512 U.S. 997 (1994) ........................................................................................................... 26

*Kahn v. Griffin*,
  2004 WL 1635846 (D. Minn. July 20, 2004) ..................................................................... 22

*Karcher v. Daggett*,
  462 U.S. 725 (1983) ...................................................................................................... 19, 21

*Kenny v. Wilson*,
  885 F.3d 280 (4th Cir. 2018) ............................................................................................... 9

*Keystone Driller Co. v. General Excavator Co.*,
  290 U.S. 240 (1933) ...................................................................................................... 36, 38

*Kirkpatrick v. Preisler*,
  394 U.S. 526 (1969) ........................................................................................................... 19

*Krieger v. Loudon Cty.*,
    2014 WL 4923904 (W.D. Va. Sept. 30, 2014) .................................................... 18

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006) ......................................................................... 21, 26

*League of Women Voters of Fla., Inc. v. Florida Sec. of State*,
    32 F.4th 1363 (11th Cir. 2022) ............................................................. 35

*Libertarian Party of Va. v. Virginia State Bd. of Elections*,
    2010 WL 3732012 (E.D. Va. Sept. 16, 2010), ........................................... 13

*Little v. Bank of Am., N.A.*,
    769 F. Supp. 2d 954 (E.D. Va. 2011) ...................................................... 30

*Little v. Reclaim Idaho*,
    140 S. Ct. 2616 (2020) ...................................................................... 34

*Lopez v. City of Houston*,
    617 F.3d 336 (5th Cir. 2010) ............................................................... 11

*Lovern v. Edwards*,
    190 F.3d 648, (4th Cir. 1999) ............................................................... 7

*Manufacturers' Fin. Co. v. McKey*,
    294 U.S. 442 (1935) ......................................................................... 36

*Maryland Cit. for A Representative Gen. Assembly v. Governor of Md.*,
    429 F.2d 606 (4th Cir. 1970) ........................................................... 29, 33

*McBurney v. Cuccinelli*,
    616 F.3d 393 (4th Cir. 2010) ............................................................... 14

*Memphis A. Phillip Randolph Inst. v. Hargett*,
    473 F. Supp. 3d 789 (M.D. Tenn. 2020) ................................................... 36

*Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*,
    855 F.3d 573 (4th Cir. 2017) ............................................................... 28

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022) ....................................................................... 34

*Merrill v. People First of Ala.*,
    141 S. Ct. 190 (2020) ....................................................................... 34

*Merrill v. People First of Ala.*,
    141 S. Ct. 25 (2020) ........................................................................ 34

*Moore v. Harper,*
    142 S. Ct. 1089 (2022) ................................................................................. 34

*Moseley v. Price,*
    300 F. Supp. 2d 389 (E.D. Va. 2004) ........................................................ 24

*Nanni v. Aberdeen Marketplace, Inc.,*
    878 F.3d 447 (4th Cir. 2017) ...................................................................... 10

*Nken v. Holder,*
    556 U.S. 418 (2009) ...................................................................................... 9

*North Carolina State Conf. of NAACP v. Cooper,*
    397 F. Supp. 3d 786 (M.D.N.C. 2019) ...................................................... 18

*North Carolina v. Covington,*
    137 S. Ct. 1624 (2017) (per curiam) .................................................... 17, 40

*Page v. Bartels,*
    248 F.3d 175 (3d Cir. 2001) ....................................................................... 18

*Papasan v. Allain,*
    478 U.S. 265 (1986) .................................................................................... 14

*Passaro v. Virginia,*
    935 F.3d 243 (4th Cir. 2019) ...................................................................... 13

*PBM Prods., LLC v. Mead Johnson & Co.,*
    639 F.3d 111 (4th Cir. 2011) ...................................................................... 28

*Perry v. Judd,*
    471 Fed. Appx. 219 (4th Cir. 2012) .................................................... passim

*Perry-Bey v. City of Norfolk,*
    678 F. Supp. 2d 348 (E.D. Va. 2009) ........................................................ 27

*Pileggi v. Aichele,*
    843 F. Supp. 2d 584 (E.D. Pa. 2012) ......................................................... 22

*Political Action Conference of Ill. v. Daley,*
    976 F.2d 335 (7th Cir. 1992) .......................................................... 22, 23, 28

*Potter Instrument Co. v. Storage Tech. Corp.,*
    641 F.2d 190 (4th Cir. 1981) ...................................................................... 28

*Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.,*
    324 U.S. 806 (1945) .............................................................................. 36, 37

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
    506 U.S. 139 (1993) ............................................................................................. 13

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) (per curiam) ...................................................................... passim

*Republic of Paraguay v. Allen*,
    134 F.3d 622 (4th Cir. 1998) ......................................................................... 16, 17

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    140 S. Ct. 1205 (2020) (per curiam) .............................................................. 33, 34

*Republican Party of Ore. v. Keisling*,
    959 F.2d 144 (9th Cir. 1992) .............................................................................. 22

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ....................................................................................... passim

*Rockville Cars, LLC v. City of Rockville*,
    891 F.3d 141 (4th Cir. 2018) ................................................................................ 8

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ................................................................................ 8

*Shapiro v. McManus*,
    577 U.S. 39 (2015) .............................................................................................. 18

*Shea v. Angulo*,
    19 F.3d 343 (7th Cir. 1994) ................................................................................ 30

*Short v. Brown*,
    893 F.3d 671 (9th Cir. 2018) .............................................................................. 35

*Simons v. Montgomery Cnty. Police Officers*,
    762 F.2d 30 (4th Cir. 1985) ................................................................................ 30

*South Carolina Wildlife Fed. v. Limehouse*,
    549 F.3d 324 (4th Cir. 2008) .............................................................................. 38

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .............................................................................................. 9

*Thompson v. Dewine*,
    959 F.3d 804 (6th Cir. 2020) ......................................................................... 35, 39

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ......................................................................................... 25, 26

*Tyson v. Town of Homer*,
  2021 WL 8893039 (N.D. Ga. July 2, 2021)..................................................... 21

*United States v. Hays*,
  515 U.S. 737 (1995)........................................................................................ 27

*Uzuegbunam v. Preczewski*,
  141 S. Ct. 792 (2021).............................................................................. 8, 9, 11

*Vaughn v. Lewisville Indep. Sch. Dist.*,
  475 F. Supp. 3d 589 (E.D. Tex. 2020)........................................................... 27

*Virginia v. United States*,
  926 F. Supp. 537 (E.D. Va. 1995) .................................................................... 8

*Walen v. Burgum*,
  2022 WL 1688746 (D.N.D. May 26, 2022)................................................ 39, 40

*Washington v. Finlay*,
  664 F.2d 913 (4th Cir. 1981) ......................................................................... 25

*White v. Daniel*,
  909 F.2d 99 (4th Cir. 1990) ..................................................................... 28, 29

*Will v. Michigan Dept. of State Police*,
  491 U.S. 58 (1989)......................................................................................... 14

*Wilson v. Birnberg*,
  667 F.3d 591 (5th Cir. 2012) ......................................................................... 11

*Wisconsin Legislature v. Wisconsin Election Comm'n*,
  142 S. Ct. 1245 (2022) (per curiam) .............................................................. 26

## Constitutional Provisions

U.S. Const. Amd. XIV ................................................................................ passim

U.S. Const. art. III................................................................... 5, 27, 38, 39

N.J. Const. art. IV, § 3, ¶ 4 ......................................................................... 23

Va. Const. art. II, § 6-A ................................................................................. 3

## Statutes

13 U.S.C. § 141 ............................................................................................... 2

28 U.S.C. § 2107 ........................................................................................... 38

28 U.S.C. § 2284 ........................................................................................................ 18

42 U.S.C. § 1983 ................................................................................................... passim

52 U.S.C. § 10301 ..................................................................................................... 25

52 U.S.C. § 20302 ..................................................................................................... 35

Va. Code § 24.2-102 .................................................................................................. 13

Va. Code § 24.2-103 .................................................................................................. 13

Va. Code § 24.2-612 .................................................................................................. 35

Va. Code § 30-397 ....................................................................................................... 3

**Other Authorities**

1 John Norton Pomeroy, Treatise on Equity Jurisprudence § 397 (1881) .................... 36

Advisory Commission on Intergovernmental Relations, Apportionment of State
    Legislatures 30 (1963) ......................................................................................... 20

Br. of Appellant, *Goldman v. Brink*, No. 21-2180, 2022 WL 794968 (4th Cir.
    Dec. 6, 2021) ......................................................................................................... 16

Br. of U.S. Dept. of Comm., et al., *Alabama v. U.S. Dep't of Comm.*, 546 F. Supp.
    3d 1057 (M.D. Ala. 2021) (No. 3:21-cv-00211), 2021 WL 6495843 .................... 23

David Wildstein, *Census data set to arrive by September 30, keeping current
    legislative districts intact until 2023*, New Jersey Globe (Feb. 12, 2021) ............ 23

Denise Lavoie, *Civil rights group asks to join Virginia redistricting suit seeking
    new House races this year*, The Virginian-Pilot (Mar. 21, 2022) ......................... 32

Graham Moomaw, *Setting new timetable in Virginia election lawsuit, judge rips
    state for legal 'mess,'* Virginia Mercury (Mar. 21, 2022) ..................................... 32

Federal Rule of Appellate Procedure 4(a) ................................................................. 38

Federal Rule of Civil Procedure 4(d)(3) ..................................................................... 6

Federal Rule of Civil Procedure 12(b)(1) .................................................................... 7

Federal Rule of Civil Procedure 12(b)(5) ................................................................... 13

Federal Rule of Civil Procedure 12(b)(6) ............................................................... 8, 30

H.B. 5005, Va. Gen. Assem. (Spec. Sess. 2011) ........................................................ 3

Injunction, Black's Law Dictionary (11th ed., 2019) ...................................................................... 9

*Loudoun NAACP Joins Paul Goldman in Voting Rights Lawsuit*, Black Virginia
    News (Mar. 20, 2022) ............................................................................................................ 5

NJ Division of Elections, *2021 Election Information*, N.J. Dep't of State (Dec. 14,
    2021) ..................................................................................................................................... 23

Second Report of the Special Master, *Bethune-Hill v. Virginia State Bd. of
    Elections*, No. 3:14cv852 (E.D. Va. Feb. 5, 2019), ECF No. 360 ........................................ 24

## INTRODUCTION

This is a case about delay. Almost a year after the first lawsuit challenging the constitutionality of the 2021 House of Delegates election, seven months after that election took place, and just over four months before the 2022 general election, Plaintiffs filed a lawsuit challenging the 2021 election. They claim that the Commonwealth of Virginia violated their rights by holding the 2021 election with legislative maps based on 2010 Census data, and they seek as relief a federal injunction dissolving the House of Delegates and ordering a special election this November. Their eleventh-hour filing entirely precludes their relief. Waiting more than half a year to challenge the 2021 election stripped this Court of jurisdiction: there is no ongoing conduct to enjoin, leaving this Court without any remedy to redress Plaintiffs' alleged injuries. And Plaintiffs' delay precludes equitable relief, which is generally unavailable to those who sleep on their rights and which would be particularly inappropriate given the procedural and administrative chaos it would foment in Virginia's ongoing electoral process.

A different sort of delay is relevant to the merits of Plaintiffs' claims. The COVID-19 pandemic and delays at the federal level precluded Virginia from reapportioning its legislative districts in time for the 2021 general election. Plaintiffs nevertheless contend that Virginia's failure to conduct reapportionment without census data violated the Equal Protection Clause and the Voting Rights Act. These claims fail utterly. Virginia did not violate the Constitution or federal voting-rights laws when delays in the receipt of census data—for which Virginia bore no responsibility—precluded it from conducting redistricting in time for the first election after the decennial census.

With the primary election concluded and the general election looming, this Court should bring this litigation to a swift conclusion and dismiss Plaintiffs' baseless claims.

1

## FACTUAL BACKGROUND

### I.     Virginia's redistricting process and the 2021 general election

Virginia's redistricting process was delayed into the 2021 election cycle due to the COVID-19 pandemic and the federal government's failure to timely deliver the 2020 Census data to the States. When the electoral process began in Virginia in 2021, the 2020 Census data *did not exist*. The COVID-19 pandemic prevented the federal government from complying with its statutory deadlines to deliver census data to the States, and Virginia did not obtain usable data from the 2020 Census until 79 days *after* the conclusion of the 2021 House of Delegates primary elections—merely 23 days before early voting began in the general election.

By statute, the United States Secretary of Commerce was to deliver the apportionment reports from the 2020 Census to the President of the United States by December 31, 2020, but did not deliver those reports to the President until April 26, 2021. Stipulation of Facts ("SOF") ¶ 29 (ECF No. 21); see also 13 U.S.C. § 141(b). Similarly, by statute, the United States Census Bureau was to deliver 2020 Census data to the States for redistricting purposes by April 1, 2021. See SOF ¶ 30; see also 13 U.S.C. § 141(c). On February 12, 2021, however, the Census Bureau stated that it would not be able to deliver the data until as late as September 30, 2021, due to delays in census operations caused by the COVID-19 pandemic. SOF ¶ 30.

On August 12, 2021, the Census Bureau released census data to the States in Legacy Format Summary Files. SOF ¶ 31. The format in which those data were delivered was incompatible with the mapping software the Virginia Redistricting Commission planned to use, and the Commission therefore hired an outside consultant to reformat those data. *Ibid.* The Commission commenced the redistricting process when it received those reformatted data on August 26, 2021. SOF ¶¶ 32–33. August 26 was 79 days *after* the primary elections for the House

2

of Delegates had concluded (early voting for those primaries had begun on March 20). See *Goldman v. Brink* ("*Goldman II*"), 2022 WL 2024745, at *3 (E.D. Va. June 6, 2022). The Commission had 45 days from August 26 to complete the reapportionment process and present new maps to the General Assembly. See Va. Const. art. II, § 6-A(d); Va. Code § 30-397(A). But absentee voting for the general election for the House of Delegates would begin a mere 23 days after the Commission commenced the redistricting process. *Goldman II*, 2022 WL 2024745, at *3.

The Commission was unable to present redistricting plans for the Senate and House of Delegates to the General Assembly within 45 days of receiving the reformatted data. SOF ¶ 35. The responsibility for creating redistricting plans therefore transferred from the Commission to the Supreme Court of Virginia. *Ibid.*; see also Va. Const. art. II, § 6-A(d), (g); Va. Code § 30-397(C). When that transfer took place, early voting for the general election had been underway for 36 days, and election day was a mere 9 days away. *Goldman II*, 2022 WL 2024745, at *3; SOF ¶¶ 35–36.

The 2021 House of Delegates election took place on November 2, 2021. SOF ¶ 36. The House of Delegates districts used in that election were the only ones in existence when the election began—those originally adopted by the General Assembly in 2011, based on the 2010 Census, H.B. 5005, Va. Gen. Assem. (Spec. Sess. 2011), as modified by a three-judge panel of this Court in 2019, see *Bethune-Hill v. Virginia State Bd. of Elections*, 368 F. Supp. 3d 872, 889 (E.D. Va. 2019). The Supreme Court of Virginia completed the congressional and state legislative redistricting plans on December 28, 2021. SOF ¶ 37.

## II.    Plaintiffs' involvement in Paul Goldman's lawsuit

On June 28, 2021, twenty days after the 2021 primaries for the House of Delegates were held—and nearly two months before Virginia received census data from the federal government—Paul Goldman sued various state officials, alleging that they were violating the U.S. and Virginia

Constitutions by conducting the upcoming 2021 general election for the House of Delegates with legislative districts drawn on the basis of 2010 Census data. See *Goldman v. Brink*, No. 3:21-cv-420 (E.D. Va.) (hereinafter, "*Goldman*"), ECF No. 1. The only appropriate remedy, he contended, would be a federal injunction dissolving the House of Delegates and ordering a statewide special election in November 2022. *Id.* at 14. Goldman named as defendants then-Governor Ralph Northam, the Virginia State Board of Elections, and various election officials in their official capacities—Christopher Piper (Commissioner of the Virginia Department of Elections); Jamilah D. LeCruise (Secretary of the State Board of Elections); John O'Bannon (Vice Chair of the State Board of Elections); and Robert Brink (Chairman of the State Board of Elections). See *id.* at 2, 8.

Over the following months, Goldman twice amended his complaint, see *Goldman* ECF Nos. 3, 18, and a prospective plaintiff attempted to intervene in the lawsuit, see *Goldman* ECF No. 22. On October 12, 2021, this Court granted the defendants' motion to dismiss on sovereign immunity grounds as to Goldman's claim under the Virginia Constitution and as to Goldman's purported federal claim against the Governor and the Virginia State Board of Elections, but denied it as to the purported federal claim against the election officials. *Goldman v. Northam* ("*Goldman I*"), 566 F. Supp. 3d 490 (E.D. Va. 2021). The Court ordered the remaining defendants to notify the Court within six days whether they were appealing the Court's ruling. *Goldman* ECF No. 41.

During this six-day window, on October 15, 2021—over three-and-a-half months after Goldman filed his first complaint—Plaintiff Jeffrey Thomas, Jr. moved to intervene in the *Goldman* case. See *Goldman* ECF No. 45. In his motion, Jeffrey Thomas contended that he and "all other qualified voters and residents of [House of Delegates District] 71 have had their voting rights and political representation unconstitutionally diluted or weakened by Defendants' failure to enact, facilitate or oversee constitutional redistricting or elections under constitutional districts."

4

*Id.* at 1–2. He also agreed with Goldman that the "remedy of 2022 House of Delegates elections is the most sensible." *Id.* at 6. He expressly argued, however, that his interests were "substantially different from and not adequately represented by Plaintiff Goldman." *Id.* at 2; see also *id.* at 3–6. He alleged, for instance, that his injuries were "greater" than Goldman's "because his voting rights and rights to equal political representation are more severely harmed." *Id.* at 2. And he "request[ed] different relief"—including an endowed fund. *Id.* at 2, 8.

Three days later, the remaining defendants appealed the Court's order, see *Goldman* ECF No. 47, and the Court stayed the case, "including all motions to intervene," pending disposition of that appeal, see *Goldman* ECF No. 49. The Fourth Circuit remanded the case to this Court to determine Goldman's Article III standing to sue. *Goldman v. Brink*, 2022 WL 794968 (4th Cir. Mar. 15, 2022). On March 24, 2022, Jeffrey Thomas filed on the *Goldman* docket a "Notice of Intent to File Separate Lawsuit and Request for Joinder."[1] *Goldman* ECF No. 71. In that "notice," he stated that he would "file a substantially identical suit … against the current [*Goldman*] Defendants" if the Court dismissed Goldman's complaint for lack of standing. *Id.* at 1. Jeffrey Thomas explicitly recognized that he "could separately file the Complaint … today" but chose not to file because he believed doing so would "unnecessarily cost him time and money to file a separate suit" and "unnecessarily burden[] the Court." *Id.* at 3–4.[2]

---

[1] Around the same time, it was reported that Plaintiff Michelle Thomas, the president of the Loudoun County chapter of the NAACP, wrote a letter to the *Goldman* Court styled as a "Motion to Join or intervene" in the *Goldman* case. See *Loudoun NAACP Joins Paul Goldman in Voting Rights Lawsuit*, Black Virginia News (Mar. 20, 2022), https://tinyurl.com/yn674uy7. It does not appear that that letter was ever entered onto the *Goldman* docket.

[2] At a status conference on March 21, 2022, Goldman asked the Court to decide Jeffrey Thomas's intervention motion. *Goldman* ECF No. 74 at 17:18, 18:7–10. The Court explained, however, that (1) Goldman's standing had to be resolved before any motions to intervene because there was no case in which Jeffrey Thomas could intervene if Goldman lacked standing, and (2) the Court in any event lacked jurisdiction to decide anything other than standing because of the limited scope of the Fourth Circuit's remand. See *id.* at 15:6–18, 18:11–18.

A three-judge panel of this Court dismissed Goldman's complaint for lack of standing. *Goldman II*, 2022 WL 2024745, at *1. The Court denied Jeffrey Thomas's motion to intervene as moot and "advise[d] Mr. Thomas that, if he elects to file his own lawsuit in this district involving the same issues in this case, he must indicate at the time of filing that his case is related to the instant case, consistent with the Court's related case procedures." *Id.* at *15 n.19.

### III.    Plaintiffs' lawsuit

Although Jeffrey Thomas told the Court in March that "the window of time to order constitutional elections is closing fast," *Goldman* ECF No. 71 at 4, he did not file his own lawsuit until June 8, 2022—over 218 days after the 2021 House of Delegates election took place, 236 days after he first unsuccessfully moved to intervene in *Goldman*, and 345 days after Goldman filed his first complaint. See Pet. for Writ of Mandamus (ECF No. 1). His filing sought a writ of mandamus against Susan Beals, Commissioner of the Virginia Department of Elections, and Brink, alleging that they violated the Equal Protection Clause of the Fourteenth Amendment by conducting the 2021 House of Delegates elections under the maps based on 2010 Census data. See *id.* ¶ 44. For relief, Jeffrey Thomas asked that this Court "order House of Delegates elections to be held under constitutional maps at the time of the 2022 general elections." *Id.* at 10.

The defendants waived service of the petition for writ of mandamus the next day, see Waiver of Service (ECF No. 9), which would ordinarily entitle them to 60 days to respond to the filing, see Fed. R. Civ. P. 4(d)(3). During a June 13, 2022 hearing, however, this Court ordered the parties to file a joint stipulation of facts four days later and ordered the defendants to file their motion to dismiss eleven days later. See Order Setting Briefing Schedule (ECF No. 10).

One day before the joint stipulation of facts was due, however, Jeffrey Thomas filed an Amended Complaint. See Amended Complaint ("AC") (ECF No. 14). The AC added two new

plaintiffs—Michelle Thomas and Phillip Thompson—as well as a new defendant (the Virginia Department of Elections) and a new claim under the Voting Rights Act of 1965 ("VRA"). *Ibid.* Specifically, the AC alleges that Beals, Brink, and the Virginia Department of Elections (collectively, "Defendants") violated the rights of Jeffrey Thomas, Michelle Thomas, and Thompson (collectively, "Plaintiffs") under the Equal Protection Clause and the VRA by "deliberately conduct[ing] unconstitutional elections in 2021 for two-year House of Delegates terms," which "harm[s] the rights of Plaintiffs and every racial minority voter in Plaintiffs' districts to equal protection, equal voting rights and equal political representation in the Virginia House of Delegates." *Id.* ¶¶ 106, 115–16. The AC requests that the Court "order House of Delegates primary elections to be held on or before September 13, 2022" and "order House of Delegates general elections to be held under constitutional maps at the time of the November 2022 general elections." *Id.* at 16.

In response to Defendants' motion for relief from the expedited briefing schedule in light of the AC, see Mot. (ECF No. 15), this Court extended the briefing schedule by a week, see Order Extending Briefing Deadlines (ECF No. 16). The Court noted Plaintiffs' "significant delay in filing the original Complaint and, subsequently, the Amended Complaint." *Id.* at 2.

## LEGAL STANDARD

"A motion made pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the court's jurisdiction over the subject matter of the complaint." *Billups v. United States*, 433 F. Supp. 3d 916, 920 (E.D. Va. 2020). "It is elementary that the burden is on the party asserting jurisdiction to demonstrate that jurisdiction does, in fact, exist." *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999). The Court "may look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter

jurisdiction exists," *Virginia v. United States*, 926 F. Supp. 537, 540 (E.D. Va. 1995) (cleaned up), "without converting the proceeding to one for summary judgment," *Edley-Worford v. Virginia Conf. of United Methodist Church*, 430 F. Supp. 3d 132, 133–34 (E.D. Va. 2019) (citing *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145 (4th Cir. 2018) (cleaned up). A claim is "plausible on its face" if a plaintiff "can demonstrate more than a sheer possibility that a defendant has acted unlawfully." *Ibid.* (cleaned up). The Court does not "accept as true a legal conclusion couched as a factual allegation." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) (cleaned up). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I.     This Court lacks subject-matter jurisdiction over Plaintiffs' claims[3]

#### A.     Plaintiffs lack standing because they do not seek a remedy that can redress their alleged injury

This Court lacks jurisdiction over Plaintiffs' claims because they have not suffered an injury that injunctive relief can redress. "At all stages of litigation, a plaintiff must maintain a personal interest in the dispute." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). This personal interest is tested by applying the related concepts of standing and mootness: standing

---

[3] In a handwritten addition to the AC, Plaintiffs requested a three-judge panel. See AC ¶ 100. Pursuant to the Court's Order Granting Motion for Enlargement of Page Limits (ECF No. 20), Defendants state that a single-judge district court may address the jurisdictional arguments contained in Part I of this brief, as well as the standing argument in Part II.B, for the same reasons set forth in the *Goldman* ruling, and in the defendants' motion to dismiss that case. See *Goldman II*, 2022 WL 2024745, at *7 ("[A] single judge may review jurisdictional questions, without convening a three-judge panel."); see also *Goldman* ECF No. 77 at 7–11.

"generally assesses whether that interest exists at the outset" of the case, while mootness "considers whether it exists throughout the proceedings." *Ibid.* To demonstrate that standing exists at the initiation of a lawsuit, "the plaintiff must not only establish an injury that is fairly traceable to the challenged conduct but must also seek a remedy that redresses that injury." *Ibid.* This "redressability" component of standing is "irreducible," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); "no federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury," *Uzuegbunam*, 141 S. Ct. at 801. Plaintiffs lack standing because they have not suffered an injury that injunctive relief can redress.

Plaintiffs' claims rest on the allegation that Defendants "deliberately conducted unconstitutional elections in 2021 for two-year House of Delegates terms." See AC ¶¶ 106, 115. To remedy that alleged injury, which took place last year, Plaintiffs seek injunctive relief. Specifically, they seek an injunctive order fashioned after the one awarded in *Cosner v. Dalton*, 522 F. Supp. 350 (E.D. Va. 1981): an order halving the terms of the House of Delegates and conducting an off-cycle House of Delegates election "under constitutional maps at the time of the November 2022 general elections." AC at 16. This relief is quintessentially injunctive. See *Nken v. Holder*, 556 U.S. 418, 428 (2009) (observing that an injunction is the court's use of its "full coercive powers" to "direct[] the conduct of a party," telling that party "what to do or not to do"); see also Injunction, Black's Law Dictionary (11th ed., 2019) (defining an injunction as "[a] court order commanding or preventing an action").

Because "plaintiffs here seek injunctive … relief, they must establish an ongoing or future injury in fact." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018); see also *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 922 (4th Cir. 2022) ("A plaintiff can satisfy the injury-in-fact requirement for prospective relief either by demonstrating a sufficiently imminent injury in fact or

by demonstrating an ongoing injury." (cleaned up)). A plaintiff may not obtain injunctive relief "based only on events that occurred in the past, even if the past events amounted to a violation of federal law." *Hoepfl v. Barlow*, 906 F. Supp. 317, 320 (E.D. Va. 1995). Thus, in *City of Los Angeles v. Lyons*, the Supreme Court rejected a plaintiff's request for an injunction on the ground that his alleged injury took place entirely in the past, but permitted his damages claim for the same conduct to proceed. 461 U.S. 95, 105, 109 (1983). This is so because "a past injury, without more, is not a sufficient basis for the issuance of injunctive relief. Put another way, an injunction cannot remedy [the plaintiff's] past injury." *Hoepfl*, 906 F. Supp. at 321; *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 454 (4th Cir. 2017) (when a plaintiff seeks "prospective declaratory and injunctive relief rather than damages, the allegations in the Complaint of past injuries do not in themselves show a present case or controversy" (cleaned up)).

Plaintiffs' invocation of *Cosner* is therefore inapposite. In *Cosner*, the plaintiffs alleged that an *upcoming* election would violate the Constitution because it would be held on the basis of an unconstitutionally apportioned map. 522 F. Supp. at 363. Indeed, conceivably every upcoming election until after the 1990 Census would repeat this constitutional violation, since Virginia intended to use those maps until the next reapportionment. *Id.* at 353. The plaintiffs therefore sought an injunction to cure those impending injuries. *Id.* at 354. The *Cosner* court exercised its equitable discretion to refuse to enjoin the upcoming election in August 1981 because doing so would have sown chaos into the electoral process. *Id.* at 363. The court instead imposed what it concluded was the next best available remedy to address the plaintiffs' impending injury: a special election held one year later. *Id.* at 364.

By contrast, Plaintiffs' alleged injury—the holding of "unconstitutional elections" in 2021—took place entirely in the past and will not repeat itself, because the districts have since

been reapportioned. See *supra* Factual Background part I. Plaintiffs do not contend that Virginia's new legislative maps are unconstitutional; rather, they acknowledge that the new House of Delegates districts are "within legal and constitutional limits." AC ¶¶ 69, 71; *id.* ¶ 81 (describing the scheduled 2023 House of Delegates election as being held "under constitutional maps"). Indeed, they are asking for an election based on those maps as their proposed remedy. AC ¶ 118; *id.* at 16. As such, Plaintiffs cannot establish a "remedy that is likely to redress [their alleged] injury." *Uzuegbunam*, 141 S. Ct. at 797. Their alleged injury occurred entirely in the past. They therefore lack standing to obtain the prospective, injunctive relief they seek.

A similar case demonstrates this Court's lack of jurisdiction. In *Hancock County Board of Supervisors v. Ruhr*, a county received the 2010 Census data too late to conduct redistricting and obtain preclearance under § 5 of the VRA, 52 U.S.C. § 10304, before the November 2011 elections. 568 Fed. Appx. 295, 298–99 (5th Cir. 2014) (per curiam). Several plaintiffs brought suits against the county. *Id.* at 299. During the pendency of the litigation, the November 2011 elections took place. *Ibid.* The Fifth Circuit affirmed the dismissal of the claims as moot, reasoning that the election officials' hands were tied by circumstances beyond their control and nothing suggested that the election officials would act in an allegedly unlawful manner in the future. *Id.* at 300–01. The court further concluded that ordering a new election would be an improper remedy. *Ibid.*; see also *Lopez v. City of Houston*, 617 F.3d 336, 340 (5th Cir. 2010) (dismissing a redistricting challenge to a past election as moot absent "egregious defiance" of federal law); *Wilson v. Birnberg*, 667 F.3d 591, 597 (5th Cir. 2012) (similar).

Plaintiffs do not allege that Defendants—or any Virginia officials or agencies—are responsible for the delayed census data. Indeed, Plaintiffs stipulated that COVID-19 and the federal government were responsible for the delays. SOF ¶¶ 29–30. Nor do they allege any

egregious violation of federal law. Even if one accepts their theory *arguendo*, they allege, at most, a faultless violation caused by the physical unavailability of census data in time for the 2021 electoral process. This Court therefore lacks jurisdiction to adjudicate Plaintiffs' claims for the same reason the Fifth Circuit lacked jurisdiction in *Hancock*.

Nor can Plaintiffs salvage their claims with conclusory allegations of continuing injuries. See, *e.g.*, AC ¶ 107 ("Without Court intervention, Defendants will continue to harm the rights of Plaintiffs … until new House of Delegates members are sworn in under constitutional lines in 2024."). According to the AC, Defendants are responsible only for the oversight and conduct of elections—not the continuance in office of elected officials. AC ¶¶ 83, 84. Because the only election Plaintiffs challenge took place in the past, and they concede that future elections using the new maps will be constitutional, see AC ¶¶ 69, 71, 81, Plaintiffs have stated no claim of ongoing injury caused *by the Defendants from whom they seek relief*. See *Hancock Cnty. Bd.*, 568 Fed. Appx. at 300–01 (treating the election itself rather than officials continuing in office as the alleged injury at issue and declining relief where there was no evidence that "county election officials deliberately defied the requirements of the [VRA] or otherwise acted egregiously or in bad faith" or were likely to do so in the future). The case should be dismissed for lack of standing.

### B.    Plaintiffs' claims are barred by sovereign immunity[4]

This Court lacks jurisdiction to adjudicate Plaintiffs' claims because sovereign immunity bars their suit. "[S]tate sovereign immunity bars all claims by private citizens against state governments and their agencies, except where Congress has validly abrogated that immunity or

---

[4] At the June 13 status conference, the Court stated that it was "not going to change [the *Goldman I*] opinion" on sovereign immunity. June 13, 2022 Hr'g Tr. 8:5–7 (ECF No. 13). The sovereign immunity arguments presented here, however, are unique to the facts of this case and were not previously raised or decided in *Goldman I*.

the state has waived it." *Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019). First, the Virginia Department of Elections is entitled to sovereign immunity. A suit against a state agency that operates as an "arm of the state" is a suit against the state. See *Goldman I*, 566 F. Supp. 3d at 502; *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. 2001). The Virginia Department of Elections is undoubtedly an arm of the state. It is headed by a Commissioner appointed by the Governor, and "carr[ies] out the duties required by law and imposed by the" State Board of Elections. Va. Code § 24.2-102(B); see also *id.* § 24.2-103 (laying out powers and duties of State Board of Elections and Department of Elections). The Board of Elections is "a quintessential arm of the state." *Libertarian Party of Va. v. Virginia State Bd. of Elections*, 2010 WL 3732012, at *5 (E.D. Va. Sept. 16, 2010), aff'd 424 Fed. Appx. 174 (4th Cir. 2011); accord *Goldman I*, 566 F. Supp. 3d at 502. It therefore follows that the Department of Elections, an executive-branch department which executes the rules and policies promulgated by the Board, is also an arm of the state. Further, the *Ex parte Young*, 209 U.S. 123 (1908), exception discussed below "has no application in suits against the States and their agencies, which are barred regardless of the relief sought." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993); see also *Libertarian Party of Va.*, 2010 WL 3732012, at *5 (the "legal fiction of the *Ex parte Young* doctrine only allows suit for injunctive or declaratory relief against individual officers or officials of a state or local government, not against a state or state agencies").[5]

    Beals and Brink are also entitled to sovereign immunity. Plaintiffs invoke this Court's jurisdiction under 42 U.S.C. § 1983 to sue Beals and Brink in their official capacities. See AC ¶ 1.

---

[5] The AC should also be dismissed as to the Virginia Department of Elections because Plaintiffs never effected service of process. See Fed. R. Civ. P. 12(b)(5); *Chien v. Grogan*, 2017 WL 1091504, at *2 (E.D. Va. Mar. 23, 2017) (dismissing *pro se* complaint for failure to execute proper service of process).

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office" and, as such, "is no different than a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). But "Congress has not abrogated sovereign immunity for § 1983 suits." *Biggs v. North Carolina Dep't of Pub. Safety*, 953 F.3d 236, 241 (4th Cir. 2020). Nor has Virginia waived its sovereign immunity as to these Defendants. Plaintiffs may maintain their claims against Beals and Brink, therefore, only if their claims fall within the limited exception to state sovereign immunity recognized in *Ex parte Young*.

*Ex parte Young* "permits a federal court to issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law, on the rationale that such a suit is not a suit against the state for the purposes of the Eleventh Amendment." *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010). This exception to state sovereign immunity, however, is "limited" and "applicable *only* when plaintiffs allege an ongoing violation of federal law." *Booth v. State of Maryland*, 112 F.3d 139, 142 (4th Cir. 1997) (emphasis added); see also *Antrican v. Odom*, 290 F.3d 178, 186 (4th Cir. 2002) ("[T]he *Ex parte Young* exception requires the allegation of an ongoing violation of federal law."). The Supreme Court "has not shown a propensity to relax this requirement"; to the contrary, "its cases analyzing the *Ex parte Young* doctrine consistently require a continuing violation of law." *Booth*, 112 F.3d at 142 (quotation marks omitted) (collecting cases). The reasons for so limiting the exception "are not difficult to discern": to "have a state sued in federal court without even a contention of an ongoing violation of federal law would only multiply 'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" *Id.* at 142–43 (quoting *Puerto Rico Aqueduct & Sewer Auth.*, 506 U.S. at 146). Accordingly, the exception "does not apply when the alleged violation of federal law occurred entirely in the past." *DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999); see also *Papasan v.*

*Allain*, 478 U.S. 265, 277–78 (1986) (*Ex parte Young* "has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past.").

Plaintiffs' claims rest solely on alleged conduct that occurred entirely in the past. Plaintiffs contend that Beals and Brink harmed them by "deliberately conduct[ing] unconstitutional elections in 2021 for two-year House of Delegates terms." See AC ¶¶ 106, 115.[6] This alleged injury took place entirely in the past and will not repeat itself because the districts have since been reapportioned. See *supra* Factual Background part I. Indeed, Plaintiffs do not allege that Beals and Brink are doing *anything* now, or will do anything in the future, to harm them. Accordingly, because Plaintiffs' alleged injury is the conduct of the 2021 House of Delegates election with legislative maps based on 2010 Census data—an injury that Plaintiffs acknowledge cannot and will not repeat itself in any future election, see AC ¶¶ 107–09—there is no ongoing violation of federal law for this Court to enjoin, making the *Ex parte Young* exception inapplicable.

The contrast between Plaintiffs' case and the *Goldman* case illuminates *Ex parte Young*'s inapplicability. Goldman filed his lawsuit in June 2021, a few months before the 2021 general election. *Goldman II*, 2022 WL 2024745, at *4. This Court correctly recognized in the *Goldman* case that "[f]or *Ex parte Young* to apply, a plaintiff must demonstrate an ongoing violation of federal law." *Goldman I*, 566 F. Supp. 3d at 500. Goldman satisfied the ongoing-violation requirement because he "contest[ed] the decision to proceed with this year's election using the

---

[6] Beals was not Commissioner of Elections during the 2021 general election and played no role in the conduct of that election. See SOF ¶ 27; *supra* Factual Background part I. This fact further highlights Plaintiffs' failure to properly invoke the *Ex parte Young* exception. That exception rests on a fiction "that when a State officer violates federal law, he is stripped of his official character, thus losing the 'cloak' of State immunity." *Bragg v. West Va. Coal Ass'n*, 248 F.3d 275, 292 (4th Cir. 2001). But Beals was not the officer who conducted the 2021 election. She could not have lost immunity because she did not commit the acts of which Plaintiffs complain.

2011 maps," *id.* at 506—an act that would certainly occur in the near future.[7] As the Court explained, the "requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent." *Id.* at 500 (quoting *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001)). In this case, however, Plaintiffs filed a lawsuit challenging the constitutionality of the 2021 general election more than eight months after the election had taken place. The source of their alleged injury is neither ongoing nor imminently threatened; it took place months ago. Plaintiffs therefore have failed to "allege an ongoing violation of federally-protected rights" sufficient to trigger the *Ex parte Young* exception. *DeBauche*, 191 F.3d at 505; see also *Allen v. Cooper*, 895 F.3d 337, 354–55 (4th Cir. 2018) (no ongoing violation of federal law where the alleged conduct had "concededly ended").

Plaintiffs' conclusory allegations that "Defendants … continue to harm the rights of Plaintiffs" do not change the analysis. AC ¶ 107; see also *id.* ¶ 108. Plaintiffs attempt to recast their claim as suffering an ongoing injury in the form of alleged "underrepresentation." *Id.* ¶¶ 81, 82. But they allege no ongoing or imminent violation of federal law committed by any Defendant which causes that alleged underrepresentation. Nor could they. As Plaintiffs allege, "Defendants Beals and Brink oversee elections in Virginia." *Id.* ¶ 83. They have no authority over representation in the General Assembly.

The Fourth Circuit rejected an argument almost identical to Plaintiffs' in *Republic of Paraguay v. Allen*, 134 F.3d 622 (4th Cir. 1998). There, a foreign state sought an injunction against the Governor of Virginia for violating the treaty rights of one of the state's citizens during a murder

---

[7] Beals and Brink appealed the Court's denial of sovereign immunity on other grounds. See Br. of Appellant, *Goldman v. Brink*, No. 21-2180, 2022 WL 794968 (4th Cir. Dec. 6, 2021).

prosecution. *Id.* at 624–26. The prisoner was awaiting capital punishment when the foreign state filed suit. *Id.* at 625. Although the alleged treaty violation took place entirely in the past, the foreign state argued that the violation was "ongoing" because its consequences persisted in the prisoner's continued custody. *Id.* at 627. The Fourth Circuit rejected this argument, reasoning that the violation was not ongoing because Virginia's officials were not "either by action or non-action" violating the prisoner's treaty rights. *Id.* at 628. The same is true here. The alleged constitutional violation took place in 2021. The purported underrepresentation which Plaintiffs allege is occurring today is not a result of any alleged *ongoing* violation of federal law.

Insofar as Plaintiffs argue that Defendants' failure to hold a special election in 2022 is a form of ongoing violation of federal law, that argument necessarily fails. No federal law requires a special election in 2022. The special election remedy that Plaintiffs seek is just that—a remedy. It is a judicial exercise of equitable discretion, not a constitutional command imposed on any state officer. See *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) (per curiam) (appropriateness of special election as a remedy in Equal Protection Clause redistricting cases depends on "equitable weighing process" and "well-known principles of equity"); see also *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (relief in redistricting cases should "be fashioned in light of well-known principles of equity"). A state officer's "failure" to perform a potential remedy that no court has ordered is not a violation of federal law. Plaintiffs cannot invoke the remedy as a grounds for suing Beals and Brink; they must instead allege that Beals and Brink are committing an ongoing violation of federal law. Plaintiffs have therefore failed to allege an ongoing violation of federal law sufficient to invoke the *Ex parte Young* exception.[8]

---

[8] Plaintiffs purport to invoke § 1983 to vindicate both their Equal Protection Clause and VRA claims. See AC ¶ 1. But even if they had brought their VRA claim as a standalone claim, Defendants are entitled to dismissal on the basis of sovereign immunity because Congress has not

## II.     Plaintiffs fail to state claims upon which relief can be granted[9]

### A.     The Fourteenth Amendment does not require a State to reapportion its legislative districts before new census data are available

Plaintiffs fail to state an Equal Protection Claim because the Fourteenth Amendment does not require a State to reapportion its legislative districts before new census data are available. Plaintiffs' claimed equal protection violation is premised on Defendants' alleged "failure to facilitate, timely adopt or oversee the required constitutional elections, redistricting or reapportionment of the Virginia House of Delegates," causing "Plaintiffs and all other similarly situated voters to be underrepresented." AC ¶ 102. At its core, Plaintiffs' claim is that Defendants violated the Fourteenth Amendment by holding the 2021 election with legislative maps based on 2010 Census data, rather than with new maps based on 2020 Census data. But when the electoral process began in Virginia in 2021, the 2020 Census data *did not exist*. The COVID-19 pandemic prevented the federal government from complying with its statutory deadlines to deliver census data to the States, and Virginia did not obtain usable census data until weeks after the conclusion of the primary elections. Plaintiffs nevertheless contend that Virginia's failure to conduct

---

abrogated Virginia's sovereign immunity in the VRA. See *North Carolina State Conf. of NAACP v. Cooper*, 397 F. Supp. 3d 786, 799 (M.D.N.C. 2019) (no "Fourth Circuit or Supreme Court case hold[s] that [a] State's Eleventh Amendment immunity has been abrogated by the VRA such that the state is subject to suit under the VRA by a private actor"); *Krieger v. Loudon Cnty.*, 2014 WL 4923904, at *3 (W.D. Va. Sept. 30, 2014) (holding that the VRA does not "contain the requisite language abrogating the state's 11th Amendment sovereign immunity"), aff'd sub nom. *Krieger v. Virginia*, 599 Fed. Appx. 112 (4th Cir. 2015).

[9] Plaintiffs' lawsuit is "an action … challenging the constitutionality of … the apportionment of [a] statewide legislative body." 28 U.S.C. § 2284(a). In such actions, a single district judge may not "enter judgment on the merits." *Id.* § 2284(b)(3). This command applies to all claims—whether constitutional or statutory—within the "action." See *Page v. Bartels*, 248 F.3d 175, 190 (3d Cir. 2001) ("[W]hen plaintiffs mount challenges to statewide legislative apportionment schemes on both Voting Rights Act and constitutional grounds, both sets of claims must be heard by a three-judge district court."). Dismissing Plaintiffs' claims for failure to state a claim would constitute a dismissal on the merits, *Shapiro v. McManus*, 577 U.S. 39, 44–46 (2015), and only a three-judge court can rule on such a motion.

redistricting without census data violated what they believe is an immutable constitutional rule requiring redistricting every ten years, come what may. This claim is devoid of merit.

The Supreme Court has interpreted the Fourteenth Amendment to require States to "'make an honest and good-faith effort to construct districts … as nearly of equal population as is practicable.'" *Brown v. Thomson*, 462 U.S. 835, 842 (1983) (quoting *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)); accord *Gaffney v. Cummings*, 412 U.S. 735, 743 (1973). When they undertake that effort, States must use "the best population data available." *Kirkpatrick v. Preisler*, 394 U.S. 526, 528 (1969). "[B]ecause the census count represents 'the best population data available,'" it is "the only basis for good-faith attempts to achieve population equality." *Karcher v. Daggett*, 462 U.S. 725, 738 (1983) (quoting *Kirkpatrick*, 394 U.S. at 528).

When the electoral process began in 2021, the most recent census data available to the Commonwealth were the 2010 Census data. See *supra* Factual Background Part I. The lawfulness of the maps used in the 2021 election therefore should not be judged by Census data obtained 79 days after the conclusion of the primary elections and less than a month before early voting began in the general election. It should be judged by the only census data available when Virginia's electoral process began—the 2010 Census data.

Plaintiffs nevertheless contend that Virginia has a hard-and-fast federal-law obligation to redistrict every ten years because using 2010 Census data for an election so far removed from the taking of the Census is unconstitutional, given the changes in Virginia's population between 2010 and 2020. See, *e.g.*, AC ¶¶ 54–55. But this argument flies in the face of *Reynolds* and its progeny. Before the 1960s, the Constitution had not been understood to impose on the States any redistricting obligations of any kind with regard to state or municipal legislative districts. See *Evenwell v. Abbott*, 578 U.S. 54, 58–59 (2016) (describing history of judicial review of state

apportionment decisions); see also *Baker v. Carr*, 369 U.S. 186, 266–67 (1962) (Frankfurter, J., dissenting). *Reynolds* held that the Fourteenth Amendment requires the States to apportion their legislative districts "as nearly of equal population as is practicable." 377 U.S. at 577. It also required the States to "adopt some reasonable plan for periodic revision of their apportionment schemes." *Id.* at 583. But nothing in the Constitution's text readily discloses how often States must adjust their legislative districts in order to comply with *Reynolds*' equal-population requirement.

The *Reynolds* Court concluded that "[d]ecennial reapportionment" was a "rational approach" to redistricting that took "into account population shifts and growth." *Ibid.* It rejected a reading of the Equal Protection Clause "requiring daily, monthly, annual or biennial reapportionment" because it recognized that "[l]imitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system." *Ibid.* The Court was emphatic, however, that decennial reapportionment was not a "constitutional requisite." *Ibid.* It required only that each State have "a reasonably conceived plan for periodic readjustment of legislative representation." *Ibid.* [10] It explained that judicial intervention in redistricting matters was "appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Id.* at 586. Virginia had no such "adequate opportunity" here prior to the 2021 election, and its use of maps based on 2010 data in that election therefore did not violate the Constitution.

That Virginia's population shifted substantially between 2010 and 2020 does not create a constitutional violation. See, *e.g.*, AC ¶¶ 12–15. *Reynolds* accounted for this possibility.

---

[10] The *Reynolds* Court's preference for decennial redistricting was itself tied to the census. The vast majority of State constitutions required the use of decennial census data to draw district lines, see Advisory Commission on Intergovernmental Relations, Apportionment of State Legislatures 30, 56 (1963), and the Supreme Court justified the decennial mark by noting that it was "the prescribed practice in 41 of the States," *Reynolds*, 377 U.S. at 583.

"[U]ndoubtedly," it noted, "reapportioning no more frequently than every 10 years leads to some imbalance in the population of districts toward the end of the decennial period." 377 U.S. at 583; see also *Karcher*, 462 U.S. at 732 ("[E]ven the census data are not perfect, and the well-known restlessness of the American people means that population counts for particular localities are outdated long before they are completed."). The Court has subsequently accommodated the realities of population movements over the course of ten years by explaining that, "*before the new census*, States operate under the legal fiction that even 10 years later, the plans [they adopted after the previous census] are constitutionally apportioned." *Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003) (emphasis added). Thus, if a State elects to conduct intra-decennial redistricting, it is free to rely on the most recent census data irrespective of how much time has passed since those data were obtained. See *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 421 (2006); *Tyson v. Town of Homer*, 2021 WL 8893039, at *6 (N.D. Ga. July 2, 2021) (using ten-year old census data to conduct end-of-decade redistricting does not violate the Equal Protection Clause).

Plaintiffs' theory would instead require States to conduct redistricting before the first election held after a census is taken, come hell or high water. That theory would impose the very "constitutional requisite" that *Reynolds* rejected. To be sure, a State's prolonged and intentional *refusal* to conduct redistricting after the timely receipt of new census data is the sort of "constitutionally suspect" conduct against which *Reynolds* warned. 377 U.S. at 584; see also, *e.g.*, *Flateau v. Anderson*, 537 F. Supp. 257, 264–65 (S.D.N.Y. 1982) (rejecting a "tradition" of reapportionment in the third year of the decade under *Reynolds*); cf. *Farnum v. Burns*, 548 F. Supp. 769, 773–74 (D.R.I. 1982) (rejecting argument that under *Reynolds* State was free to ignore timely, new census data because previous redistricting plan was fewer than ten years old). But that is not the case here. When delays in receipt of the census data—for which the State bore no

21

responsibility—have denied the State "an adequate opportunity" to conduct redistricting in time for the first election after the decennial census, the Fourteenth Amendment is not offended.

The lower federal courts have widely adopted this reading of *Reynolds*.[11] In *Political Action Conference of Illinois v. Daley*, for example, the municipality received the 1990 Census data just fifteen days before local legislative elections in 1991. 976 F.2d 335, 337–38 (7th Cir. 1992). The elections thus proceeded on a map drawn using the 1980 Census data. *Id.* at 338. The Seventh Circuit rejected a redistricting challenge brought under the Equal Protection Clause and

---

[11] See, *e.g.*, *Garcia v. 2011 Legislative Reapportionment Comm'n*, 938 F. Supp. 2d 542, 550 (E.D. Pa. 2013) ("In applying the standard set forth in *Reynolds*, federal courts have recognized that no constitutional violation exists when an outdated legislative map is used, so long as the defendants comply with a reasonably conceived plan for periodic reapportionment."), aff'd 559 Fed. Appx. 128 (3d Cir. 2014); *Clark v. Marx*, 2012 WL 41926, at *8–10 (W.D. La. Jan. 9, 2012) (holding that a reasonable post-census delay in redistricting does not violate the Equal Protection Clause even where the delay prolongs the terms of officers elected on the basis of old maps); *Graves v. City of Montgomery*, 807 F. Supp. 1096, 1110 (M.D. Ala. 2011) (holding that lag times in post-census redistricting do not violate *Reynolds* even if they require the conduct of a post-census election on pre-census maps); *Fairley v. Forrest Cnty.*, 814 F. Supp. 1327, 1343 (S.D. Miss. 1993) ("One election every 20 years … will be held so close to the taking of the decennial census that decision makers acting in good faith may be unable to devise a constitutionally-acceptable reapportionment in time for the regularly scheduled elections. Does that mean that the Constitution requires the holding of special elections in every state in which this occurs once every 20 years? This Court thinks not."); *Bryant v. Lawrence Cnty.*, 814 F. Supp. 1346, 1354 (S.D. Miss. 1993) ("Elections held under [a map premised on the previous decade's census data] in the year that new census data becomes available, but before redistricting can take place, should not be set aside and new elections ordered."); see also *Gaona v. Anderson*, 989 F.2d 299, 302 (9th Cir. 1993) (holding that VRA did not require the use of new maps for a special election for a vacancy that arose after the new maps were adopted but before the first regularly scheduled post-census election took place); *Republican Party of Ore. v. Keisling*, 959 F.2d 144, 145–46 (9th Cir. 1992) (holding that post-redistricting assignment of senators to new districts did not violate *Reynolds* notwithstanding that reassigned senators would not stand for election until four years after census); *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 593–94 (E.D. Pa. 2012) (holding that *Reynolds* did not require an injunction forbidding state from holding 2012 election on the basis of 2001 maps during pendency of post-2010 Census redistricting process); *Kahn v. Griffin*, 2004 WL 1635846, at *6 (D. Minn. July 20, 2004) (holding that "a predictable and temporary delay in implementing new census figures that occurs once every twenty years and results in some voters being either somewhat under or over-represented for an approximately three-year period" does not violate *Reynolds*).

VRA. It reasoned:

> Redistricting is complex; obtaining new census data is merely the first step toward developing and approving a new map for the City. Therefore, the critical question is whether the 1991 election, which was based on a ward map approved in 1985 using 1980 census data, was valid under *Reynolds*? *Reynolds*' explicit language concerning the probable "imbalance" in the map toward the end of the decennial period demonstrates that Chicago's 1991 election represents no constitutional violation.

*Id.* at 340; see also *Bonilla v. City Council of City of Chicago*, 809 F. Supp. 590, 598 (N.D. Ill. 1992) (rejecting similar claim). Similarly, in *French v. Boner*, a municipality received the 1990 Census data too late in 1991 to conduct redistricting in time for the 1991 general election and held that election on the basis of the 1981 map. 963 F.2d 890, 891 (6th Cir. 1992). The next election was not scheduled until 1995. *Ibid*. The Sixth Circuit rejected an Equal Protection Clause challenge and request for a special election, holding that *Reynolds* does not require the first election after a decennial census to proceed on maps based on that most recent census. *Id.* at 891–92.

Plaintiffs therefore have not alleged a violation of the Equal Protection Clause. Virginia received the 2020 Census data 79 days after the primary election and 23 days before the general election began.[12] Plaintiffs do not allege that Virginia lacks a "reasonable plan for a periodic

---

[12] Virginia was not alone in its redistricting process being affected by the COVID-19 pandemic. The pandemic and the federal government's resulting failure to timely deliver the 2020 Census data affected 27 States with 2021 redistricting deadlines. See Br. of U.S. Dept. of Comm., et al. at 18, *Alabama v. U.S. Dep't of Comm.*, 546 F. Supp. 3d 1057 (M.D. Ala. 2021) (No. 3:21-cv-00211), 2021 WL 6495843. New Jersey, for example, held elections for both chambers of its legislature in November 2021. See NJ Division of Elections, *2021 Election Information*, N.J. Dep't of State (Dec. 14, 2021), https://tinyurl.com/yc88ref8. A year before the election, New Jersey adopted a constitutional amendment requiring the use of its 2011 legislative maps for the 2021 election unless the State received the 2020 Census data by February of 2021. See N.J. Const. art. IV, § 3, ¶ 4. New Jersey did not receive data by the February deadline, and it held the 2021 election on the basis of the 2011 maps. See David Wildstein, *Census data set to arrive by September 30, keeping current legislative districts intact until 2023*, New Jersey Globe (Feb. 12, 2021), https://tinyurl.com/pmy7t5yy. To the best of Defendants' knowledge, no one has challenged this provision as a violation of the Equal Protection Clause.

revision of [its] apportionment scheme[]." *Reynolds*, 377 U.S. at 583. Nor do they allege that Virginia received the 2020 Census data such that it had an "adequate opportunity to" conduct redistricting "in a timely fashion" before the 2021 election. *Id.* at 586. Their claim therefore depends only on this Court imposing an immutable command to conduct redistricting at all hazards before the first post-census general election. That simply is not the law. See *supra* pp. 20–23 & n. 11. Accordingly, it is as much a constitutional non sequitur to use the 2020 Census data to review the constitutionality of the 2021 election as it would be to use those data to review the 2019 Virginia Senate and House of Delegates elections. See, *e.g.*, Second Report of the Special Master, *Bethune-Hill v. Virginia State Bd. of Elections*, No. 3:14cv852 (E.D. Va. Feb. 5, 2019), ECF No. 360, at 34 n.23 ("[T]he 2010 Census still provides what is unquestionably the best information now available about Virginia's population demography, and is the appropriate data to use.").

### B.    Plaintiffs fail to state a viable Voting Rights Act claim

Plaintiffs' new VRA claim is half-formed and deficient in numerous ways. Plaintiffs do not even cite the section of the VRA under which they are bringing their claim. The Court should dismiss the AC since Plaintiffs have not identified their claim. Even assuming that they intend to plead a vote-dilution claim under § 2, compare, *e.g.*, AC ¶ 54 ("Plaintiffs … had their voting strength and political representation unconstitutionally diluted or weakened by the failure of Defendants to conduct, enact, or oversee decennial constitutional reapportionment, redistricting, or elections."), with *Hall v. Virginia*, 385 F.3d 421, 427 (4th Cir. 2004) (describing a § 2 vote dilution claim as alleging "that a particular practice operates to cancel out or minimize the voting strength of a minority group" (cleaned up)), they have failed.

First, Plaintiffs invoke this Court's jurisdiction only through 42 U.S.C. § 1983, see AC ¶ 1, but it is "well-settled that § 1983 cannot serve as a means to enforce a statute that has its own comprehensive internal enforcement scheme, as the Voting Rights Act clearly has," *Moseley v.*

*Price*, 300 F. Supp. 2d 389, 396 n.11 (E.D. Va. 2004); see also *Jafari v. City of Richmond*, 2006 WL 5444365, at *3–4 (E.D. Va. May 12, 2006) (holding VRA intended to supplant any remedy otherwise available under § 1983). Therefore, Plaintiffs' VRA claim fails as a matter of law.[13]

Second, Plaintiffs' allegations fall woefully short of stating a § 2 claim. Section 2 prohibits the application of any "voting qualification or prerequisite to vote or standard, practice, or procedure in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Establishing a § 2 violation "requires consideration of 'the totality of circumstances' in each case and demands proof that 'the political processes leading to nomination or election in the State or political subdivision are not *equally open* to participation' by members of a protected class '*in that its members have less opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Brnovich*, 141 S. Ct. at 2332 (quoting 52 U.S.C. § 10301(b)).

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court "set out three threshold requirements for proving a § 2 vote-dilution claim." *Brnovich*, 131 S. Ct. at 2333. Those preconditions are: (1) "that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) that the minority group "is politically cohesive;" and (3) "that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Growe v. Emison*, 507 U.S. 25, 40–41 (1993) (cleaned up). The plaintiff must demonstrate that each *Gingles* precondition is satisfied as to each challenged

---

[13] It is an open question in the Fourth Circuit whether § 2 of the VRA furnishes a private right of action. See *Washington v. Finlay*, 664 F.2d 913, 926 (4th Cir. 1981); see also *Brnovich v. Democratic Nat'l Comm'n*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring); cf. *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, --- F. Supp. 3d ---, 2022 WL 496908, at *9–17 (E.D. Ark. Feb. 17, 2022) (holding that § 2 does not create a private cause of action). The Court need not resolve this question in this case because, even if § 2 furnishes a private right of action, Plaintiffs have failed to state a claim under it.

district. See *Perry*, 548 U.S. at 437; *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018). "[S]atisfying the *Gingles* preconditions is necessary but not sufficient to show a § 2 violation." *Wisconsin Legislature v. Wisconsin Election Comm'n*, 142 S. Ct. 1245, 1248–49 (2022) (per curiam) (citing *Johnson v. De Grandy*, 512 U.S. 997, 1011–12 (1994)). If a plaintiff satisfies the three *Gingles* preconditions, "it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott*, 138 S. Ct. at 2331.

To survive a motion to dismiss, therefore, Plaintiffs must allege facts sufficient to give rise to the inference that they satisfy each of the *Gingles* preconditions for each district they challenge. See *Hall*, 385 F.3d at 426, 431–33. Plaintiffs have failed to allege any facts even remotely sufficient to establish any of the three *Gingles* preconditions.

Michelle Thomas and Thompson are Black voters in Virginia. SOF ¶¶ 13, 17, 22, 26. During the 2021 general election, Michelle Thomas lived and voted in District 32, *id.* ¶¶ 9, 10, 12, and Thompson lived and voted in District 10, *id.* ¶¶ 18, 19, 21. But apart from that basic information, the only "allegation" Michelle Thomas and Thompson make in support of their VRA claims is the conclusory statement that "[t]he deviations between the House of Delegate district populations violate the constitutional rights of Plaintiffs and every racial minority voter in Plaintiffs' districts to have their votes counted equally through their representatives elected to the General Assembly." AC ¶¶ 113, 114. They allege nothing relating to the racial composition of Districts 10 and 32; they allege nothing relating to the cohesion of any minority group anywhere in Virginia, much less in Districts 10 and 32; and they allege nothing relating to white and minority voting patterns in Districts 10 and 32. In short, they do not explain how members of their minority group had "*less opportunity*" than other members of the electorate to participate in the electoral process. *Brnovich*, 141 S. Ct. at 2331–32. To the contrary, the theory of their baseless *Reynolds*

26

claim suggests that white and minority voters in their districts alike suffered the same "underrepresentation." The Court should dismiss Michelle Thomas's and Thompson's throwaway VRA claim for want of alleging a single fact necessary to establish that claim.

Jeffrey Thomas's VRA claim is even more deficient. Jeffrey Thomas does not allege that he is a member of any racial minority group. He lived and voted in District 71 in the 2021 general election. SOF ¶¶ 1, 2, 4. Following the district court's remedial redistricting order in *Bethune-Hill*, 368 F. Supp. 3d 872, District 71 is a majority-minority district comprised of 59% Black residents. SOF ¶ 49. Notwithstanding that a three-judge panel of this Court created District 71 as a majority-minority district just three years ago, Jeffrey Thomas alleges that District 71 violates the rights of "minority voter[s]." AC ¶¶ 113–14. But beyond that unsupported legal conclusion, Jeffrey Thomas's VRA claim is inscrutable. First, his failure to allege his race means he lacks Article III standing. Article III requires a plaintiff to establish that he has "suffer[ed] an invasion of a legally protected interest that is concrete and particularized to him." *Goldman II*, 2022 WL 2024745, at *8. When the alleged injury is based on racial discrimination, Article III limits standing "only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984) (quoting *Heckler v. Mathews*, 465 U.S. 728, 740 (1984)). For a claim of race-based voter dilution, the voter must demonstrate that he "personally[ ] has been injured" by the racial classification. *United States v. Hays*, 515 U.S. 737, 744 (1995). In VRA cases, therefore, the plaintiff must demonstrate that he is a member of a racial group who has been allegedly subjected to the race-based dilution. See, *e.g.*, *Vaughn v. Lewisville Indep. Sch. Dist.*, 475 F. Supp. 3d 589, 595 (E.D. Tex. 2020); see also *Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348, 363 (E.D. Va. 2009).

Even apart from his lack of standing, like Michelle Thomas and Thompson, Jeffrey Thomas

has failed entirely to include a single allegation about the cohesiveness of any racial minority group or the effect of a white majority bloc to defeat the candidates preferred by that racial minority group. Indeed, any such allegations would be facially inconsistent with the fact that Jeffrey Thomas resides in and votes in a majority-minority district. SOF ¶¶ 1, 2, 6; AC ¶ 5.[14]

### C.      Laches bars Plaintiffs' claims for injunctive relief

The claims Plaintiffs now bring have been available to them for over a year. See, *e.g.*, June 13, 2022 Hr'g Tr. 10 (ECF No. 13) ("[Y]ou could have filed your lawsuit last year when Mr. Goldman did."). Plaintiffs nevertheless waited until the eleventh hour to file their lawsuit challenging an election that took place nearly eight months ago and seeking the extraordinary relief of federally imposed statewide elections in just four months. This delay entirely precludes their relief as a matter of law. The Court should therefore dismiss Plaintiffs' claims.

Laches is an affirmative defense to claims for equitable relief, *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990), and may be decided on a motion to dismiss when "[a]ll facts necessary to decide whether [the] … defense applies … appear on the face of the complaint," *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 577 (4th Cir. 2017); see *Potter Instrument Co. v. Storage Tech. Corp.*, 641 F.2d 190 (4th Cir. 1981) (affirming laches dismissal). "Estoppel by laches generally applies to preclude relief for a plaintiff who has unreasonably 'slept' on his rights." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 121 (4th Cir. 2011). Laches bars relief where there is "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *White*, 909 F.2d at 102 (cleaned up). Plaintiffs'

---

[14] Insofar as Plaintiffs' VRA claim is just a restatement of their Equal Protection Clause claim, that claim fails for the same reasons that the Equal Protection Clause fails. See *supra* Part II.A. Virginia violated no federal-law obligation when it held the 2021 election on the basis of the pre-2020 Census maps. See, *e.g.*, *Political Action Conf. of Ill.*, 976 F.2d at 337–40; *Gaona*, 989 F.2d at 302.

lack of diligence in bringing their claims appears on the face of their complaint. Their delay is also presumptively prejudicial. Laches therefore bars relief.

The first element of laches—lack of diligence—"exists where 'the plaintiff delayed inexcusably or unreasonably in filing suit.'" *Ibid.* (cleaned up). Time is particularly of the essence in bringing equitable claims related to elections because "any claim against a state electoral procedure must be expressed expeditiously." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (citing *Williams v. Rhodes*, 393 U.S. 23, 34–35 (1968)). For this reason, courts have recognized that a delay of even a few weeks or months is dispositive for applying laches in the election context. See *Curtin v. Virginia State Bd. of Elections*, 463 F. Supp. 3d 653, 656, 659 (E.D. Va. 2020) (holding that "[p]laintiffs failed to demonstrate the requisite diligence" and applying laches to deny motion to enjoin an absentee ballot procedure because they "did not file suit until approximately two months" after the procedure became public knowledge and on the cusp of primary elections); see also *Perry v. Judd*, 471 Fed. Appx. 219, 228 (4th Cir. 2012) (affirming application of laches to deny preliminary injunction in election case when plaintiff "was able to bring these constitutional challenges for over four months … [but] waited until the eleventh hour to pursue his claims"); *Maryland Cit. for A Representative Gen. Assembly v. Governor of Md.*, 429 F.2d 606, 611 (4th Cir. 1970) (holding injunctive relief was unavailable to plaintiffs who first sought injunction thirteen weeks prior to the filing deadline for primary elections).

As for the second element of laches—prejudice to Defendants—Defendants are "aided by the *inference of prejudice* warranted by the plaintiff's delay," at which point the burden shifts to the plaintiff "to excuse his apparent laggardness and to prove facts manifesting an absence of actual prejudice." *Giddens v. Isbrandtsen Co.*, 355 F.2d 125, 128 (4th Cir. 1966) (emphasis added). And, in the context of elections, lack of diligence "clearly" prejudices election officials, "whose

planning has been thrown into far greater confusion than would have been the case with a timely legal action." *Perry*, 471 Fed. Appx. at 226; see also *ibid.* ("Ballots and elections do not magically materialize. They require planning, preparation, and studious attention to detail if the fairness and integrity of the electoral process is to be observed."). Further, because election officials are "charged with ensuring the uniformity, fairness, accuracy, and integrity of Virginia elections," the "public is potentially prejudiced as well"—an interest that the Supreme Court has "repeatedly credited." *Id.* at 227; see also *Clements v. Fashing*, 457 U.S. 957, 965 (1982) ("States have important interests in protecting the integrity of their political processes [and] in ensuring that their election processes are efficient.").

Plaintiffs' inexcusable delay is apparent from the AC. Jeffrey Thomas moved to intervene in the *Goldman* case on October 15, 2021—eight months before he initiated this action. AC ¶ 74; *Goldman* ECF No. 45. In conjunction with that motion, Jeffrey Thomas had prepared a filing-ready complaint raising essentially the same factual allegations and legal arguments contained in his June 8, 2022 petition for writ of mandamus. Compare *Goldman* ECF No. 45-3,[15] with Pet. (ECF No. 1). Moreover, he recognized that his interests and the relief he sought differed from those of the plaintiff in *Goldman*. *Goldman* ECF No. 45 at 2.

Given Jeffrey Thomas's acknowledged distinct interests, he had no reason whatsoever to await this Court's resolution of the *Goldman* case before asserting his separate claim; rather, he "remain[ed] free to initiate his own suit" at any time. *Shea v. Angulo*, 19 F.3d 343, 347 (7th Cir. 1994). This Court has recognized as much. See June 13, 2022 Hr'g Tr. 10:5–8 (ECF No. 13) ("I

---

[15] The AC in fact quotes extensively from the complaint attached to Jeffrey Thomas's motion to intervene. See AC ¶¶ 75–78. Courts considering a Rule 12(b)(6) motion may rely upon documents incorporated by reference in the complaint. See, *e.g.*, *Little v. Bank of Am., N.A.*, 769 F. Supp. 2d 954, 960 n.1 (E.D. Va. 2011) (citing *Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985)).

never precluded you from filing a separate lawsuit. … [Y]ou could have done that back in October and I could have had two cases going on at the same time."). Jeffrey Thomas nevertheless took no other action to advance his separate claim. Instead, in March, he filed a "Notice of Intent to File Separate Lawsuit and Request for Joinder" in which he advised this Court that he "intend[ed] to file a substantially identical suit" and referenced the proposed complaint he included in his October 2021 motion to intervene. *Goldman* ECF No. 71; see also AC ¶ 79 (discussing the notice). As Jeffrey Thomas correctly acknowledged in that notice, he "could separately file the Complaint (ECF 45-3) today." *Goldman* ECF No. 71 at 3. Despite telling the Court he was prepared to file a separate lawsuit and that he understood the time-sensitive nature of his claims, Jeffrey Thomas "chose to sit on his right to [bring his] challenge … until after" this Court dismissed the *Goldman* case. *Perry*, 471 Fed. Appx. at 224. Only on June 8, 2022—almost a year after Goldman filed his lawsuit, nearly eight months after Jeffrey Thomas first presented this Court a filing-ready complaint, and well after the 2022 primary elections began—did Jeffrey Thomas initiate this case.

Jeffrey Thomas and the other plaintiffs "had an incentive to file suit as soon as [their alleged] injuries became apparent in order to rectify the perceived wrong prior to the actual commencement of the [election]." *Curtin*, 463 F. Supp. 3d at 659; *Perry*, 471 Fed. Appx. at 224 ("Movant had every incentive" to bring his challenge to electoral procedure when the challenge became apparent). Instead, Plaintiffs' "deliberate delay" in waiting until the 2022 primary elections were nearly concluded to bring their claim seeking equitable relief ordering a new 2022 House of Delegates election "precludes the possibility of equitable relief [because] 'equity ministers to the vigilant, not to those who sleep on their rights.'" *Curtin*, 463 F. Supp. 3d at 661 (quoting *Perry*, 471 Fed. Appx. at 224). This delay is inexcusable. A finding to the contrary would encourage potential litigants "to wait until the last minute to bring constitutional challenges to state

31

election laws" and in doing so, force "hapless state election boards … to halt their scheduled election processes to wait for a ruling." *Perry*, 471 Fed. Appx. at 225.

The delay here was compounded by Jeffrey Thomas's post-filing gamesmanship. Jeffrey Thomas induced this Court to set an extraordinarily expedited schedule for briefing motions to dismiss his petition for writ of mandamus. See Proposed Scheduling Order (ECF No. 3) (requesting briefing schedule giving Defendants forty-eight hours to respond to petition); Order Setting Briefing Schedule (ECF No. 10) (ordering Defendants to file a motion to dismiss eleven days later). Three days into Defendants' eleven-day briefing window—and just one day before stipulations of fact were due— Jeffrey Thomas filed the AC, which added two new plaintiffs, one new defendant, and a novel VRA claim. The two new plaintiffs—Michelle Thomas and Thompson—have given no explanation for *their* year-long delay in bringing their claims,[16] and no Plaintiff has explained why they are just now bringing a VRA claim. Indeed, the existence of an alleged VRA claim, a statute not at issue in the *Goldman* case, is another reason why Plaintiffs should have filed their own lawsuit last year.

The "inference of prejudice warranted by the plaintiff's delay" is apparent at this late stage. *Giddens*, 355 F.2d at 128. Defendants are already deep in the process of conducting the scheduled 2022 elections, with the primary elections having been held last week. See SOF ¶ 41. But Plaintiffs seek perhaps the most extraordinary relief possible—a previously unscheduled statewide election

---

[16] Michelle Thomas, who attended the March status conference in *Goldman* and gave multiple press interviews afterwards, see Graham Moomaw, *Setting new timetable in Virginia election lawsuit, judge rips state for legal 'mess,'* Virginia Mercury (Mar. 21, 2022), https://tinyurl.com/murphz7a; Denise Lavoie, *Civil rights group asks to join Virginia redistricting suit seeking new House races this year*, The Virginian-Pilot (Mar. 21, 2022), https://tinyurl.com/2j2mpf7s, alleges that she is the current President of the Loudoun County NAACP, see AC ¶ 32. The Loudoun County chapter of the NAACP apparently sought to intervene in the *Goldman* case rather than file its own lawsuit. See *supra* p.5 n.1. Thompson similarly alleges that he is the former President of the Loudoun County NAACP. See AC ¶ 48.

compelled by federal judicial fiat. See AC at p. 14. Granting such relief "would necessarily impose great disruption upon potential candidates, the electorate and the elective process." *Maryland Cit.*, 429 F.2d at 610. And, given that the 2022 elections are already well underway, "granting the relief Plaintiffs seek has, at this point, become impractical and likely ineffectual," "would tax the system[,] and may well … breed more chaos." *Curtin*, 463 F. Supp. 3d at 660; see also *Perry*, 471 Fed. Appx. at 227 (finding that "respondents have clearly suffered prejudice due to Movant's lack of diligence" in bringing belated equitable challenge by disrupting the "demanding" schedule needed to ensure timely elections and "creating confusion for election officials across the state"). And, although the prejudice to Defendants is clear, "in a broad sense, the public is potentially prejudiced as well, as [Defendants] are charged with ensuring the uniformity, fairness, accuracy, and integrity of Virginia elections." *Perry*, 471 Fed. Appx. at 227. Given the extreme disruption to Defendants' responsibility to administer elections and the attendant harm to the public that Plaintiffs' claims entail, their inexcusable delay in bringing suit has prejudiced Defendants. Accordingly, this Court should dismiss this case as barred by laches.

### D. Constitutional and prudential principles foreclose Plaintiffs' relief

#### 1. *Purcell* bars equitable relief this close to an election

Constraints rooted in the federal Constitution also preclude the extraordinary relief Plaintiffs seek. The Supreme Court "has repeatedly emphasized that federal courts ordinarily should not alter state election laws in the period close to an election—a principle often referred to as the *Purcell* principle." *Democratic Nat'l Comm. v. Wisconsin State Legis.*, 141 S. Ct. 28, 30 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."). In *Purcell*,

the Supreme Court vacated a Ninth Circuit injunction of an Arizona voter-identification law "[g]iven the imminence of the election and the inadequate time to resolve the factual disputes." 549 U.S. at 5–6. The rationale underlying the *Purcell* decision is straightforward: "When an election is close at hand, the rules of the road should be clear and settled …. because running a statewide election is a complicated endeavor." *Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J.). The Supreme Court and other federal courts have consistently applied the *Purcell* principle to prevent federal courts from interfering with state election rules at a time when doing so would inject "judicially created confusion" into a pending election's administration, *Republican Nat'l Comm.*, 140 S. Ct. at 1207, causing "voter confusion and consequent incentive to remain away from the polls," *Purcell*, 549 U.S. at 4–5.[17]

Recent Supreme Court decisions show that a federal injunction compelling a State to hold an entirely new election in 2022 would violate *Purcell*. In February, the Supreme Court stayed a district court's preliminary injunction ordering a State to redraw allegedly gerrymandered districts, even though the *primary* elections were still two months away. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of application for stays). Similarly, in March, the Court denied a request for a stay that would have "requir[ed] North Carolina to change its existing congressional election districts for the upcoming 2022 primary and general elections" because those elections were too close for federal judicial intervention. *Moore v. Harper*, 142 S. Ct. 1089, 1089 (2022) (Kavanaugh, J., concurring in denial of application for stay). And just days ago, the Supreme Court stayed a lower-court injunction ordering a State to redraw its legislative maps five

---

[17] Recent Supreme Court cases applying the *Purcell* rule include, for instance, *Merrill v. People First of Ala.*, 141 S. Ct. 25 (2020); *Andino v. Middleton*, 141 S. Ct. 9 (2020); *Merrill v. People First of Ala.*, 141 S. Ct. 190 (2020); *Clarno v. People Not Politicians*, 141 S. Ct. 206 (2020); and *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020).

months before the primary election. See *Ardoin v. Robinson*, --- S. Ct. ---, 2022 WL 2312680 (June 28, 2022). Lower courts have followed suit. See, *e.g.*, *League of Women Voters of Fla., Inc. v. Florida Sec. of State*, 32 F.4th 1363, 1371 (11th Cir. 2022) (holding that, "[w]hatever *Purcell*'s outer bounds," an injunction affecting elections "set to begin in *less* than four months" certainly "fits within them"); *Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir. 2020) (applying *Purcell* principle notwithstanding that the general election was "months away" because "important, interim deadlines" were "imminent" and "moving or changing" them would have "inevitable, other consequences"); *Short v. Brown*, 893 F.3d 671, 680 (9th Cir. 2018) (rejecting plaintiffs' argument that a State would have "sufficient time between [June] and the November [] election to make the necessary changes" because the electoral changes "would be exceedingly difficult, and would 'themselves result in voter confusion and consequent incentive to remain away from the polls'" (quoting *Purcell*, 549 U.S. at 4–5)).

The 2022 electoral process began months ago. Virginia candidates for the November election were permitted to begin collecting signatures to qualify *six months ago*, on January 1, 2022. SOF ¶ 39. The statewide primary elections took place last week, on June 21, 2022. SOF ¶ 41. Under federal and state law, absentee voting for the November 2022 general election must begin no later than September 24, 2022—fewer than three months from now. See 52 U.S.C. § 20302; Va. Code § 24.2-612. And election day is just over four months from today. SOF ¶ 38. The 2022 Virginia electoral process is therefore well within the *Purcell* window. And the injunction Plaintiffs seek—the dissolution of the House of Delegates and the ordering of a new, statewide election—is orders of magnitude more intrusive on Virginia's electoral process than the sorts of judicial interventions the Court has already rejected this year under *Purcell*.

Plaintiffs' delay in raising their claims compounds their *Purcell* problem. The rationale

underlying the *Purcell* principle shares some similarities with the equitable laches analysis. See, *e.g.*, *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) ("Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason."). Thus, in *Crookston*, the Sixth Circuit criticized the plaintiff for "offer[ing] no reasonable explanation for waiting so long to file this action," necessitating the application of the *Purcell* principle because the election was "imminent" and there was "inadequate time to resolve factual disputes." *Ibid.* (quoting *Purcell*, 549 U.S. at 5–6). "[A]ny court order that affects an election … can be presumed to cause prejudice to the extent the court order is issued close to an election." *Memphis A. Phillip Randolph Institute v. Hargett*, 473 F. Supp. 3d 789, 801 (M.D. Tenn. 2020) (citing *Purcell*, 549 U.S. at 4–5). Plaintiffs' delay in bringing their claims has caused the *Purcell* problem with their complaint and the concomitant prejudice that would result to Defendants, elected representatives, and the people of Virginia.

### 2.     The "unclean hands" doctrine is irrelevant to this case

The Court has suggested that the equitable principle of "unclean hands" might bar application of the *Purcell* principle. June 13, 2022 Hr'g Tr. 9:10-24 (ECF No. 13). But this principle is entirely inapplicable for three reasons. First, the "unclean hands" doctrine is an affirmative *defense* against equitable relief. See *Manufacturers' Fin. Co. v. McKey*, 294 U.S. 442, 453 (1935) (Unclean-hands doctrine is "applicable only against one who affirmatively has sought equitable relief."); see also *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (similar); *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 244–45 (1933) ("As authoritatively expounded, the words and the reasons upon which [the unclean-hands doctrine] rests extend to the party seeking relief in equity."); 1 John Norton Pomeroy, Treatise on Equity Jurisprudence § 397, at 433 (1881) (providing that the doctrine

applies to the party who "seeks to set the judicial machinery in motion and obtain some remedy"). It therefore cannot be deployed against Defendants, who have not invoked the equity jurisdiction of this Court.

Second, even if Plaintiffs could invoke the unclean-hands doctrine, it would not apply here because Defendants' hands are clean. The unclean-hands doctrine enforces the general principle that those invoking a court's equity jurisdiction must "have acted fairly and without fraud or deceit as to the controversy in issue." *Precision Instrument Mfg. Co.*, 324 U.S. at 814–15. Defendants have acted in such a manner. Actions by largely non-overlapping defendants in litigating a separate case provide no basis for applying the doctrine here. Plaintiffs wrongly alleged that the *Goldman* defendants engaged in "stall tactics," but nothing that happened in *Goldman* in any way prevented Plaintiffs from promptly filing their own suit. Plaintiffs were free to bring this action at any time; they simply chose to wait until after *Goldman* was dismissed. They cannot somehow impute the consequences of their own inequitable delay to Defendants.

In any event, the *Goldman* defendants engaged in no inequitable delay tactics. Goldman filed a complaint on June 28, 2021 and an amended complaint on July 6, 2021. See *Goldman II*, 2022 WL 2024745, at *4–5. The election official defendants were served on July 13, 2021, see *Goldman* ECF No. 6, and timely filed a motion to dismiss, *ibid.*; see also *Goldman* ECF No. 12. Two weeks later, the *plaintiff* filed a motion for an extension of time to respond to the motion. *Goldman* ECF No. 14. He instead then moved to amend his complaint yet again—less than two months before the challenged election. *Goldman II*, 2022 WL 2024745, at *5. The defendants then filed a motion to dismiss the second amended complaint a day early, see *Goldman* ECF Nos. 23, 24; the plaintiff "filed his Response a day late," *Goldman II*, 2022 WL 2024745, at *5. The Court then informed the parties at a hearing on October 12 that it was uncertain of its jurisdiction because

the plaintiff may have lacked standing. Goldman ECF No. 43 at 16. Notwithstanding that it was unsure of its Article III authority to adjudicate the plaintiff's complaint, the Court granted in part and denied in part the defendants' motion to dismiss on sovereign immunity grounds. *Goldman I*, 566 F. Supp. 3d 490.

That order triggered the defendants' statutory right to an interlocutory appeal. See *South Carolina Wildlife Fed. v. Limehouse*, 549 F.3d 324, 327 n.1 (4th Cir. 2008). Although Congress has prescribed a thirty-day deadline to appeal, see 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a), the Court ordered the defendants to decide whether to appeal within six days of its order, *Goldman* ECF No. 41. The defendants noticed their appeal within six days, and the Court stayed the case pending the appeal. See *Goldman* ECF No. 49; see also *Industrial Servs. Grp., Inc. v. Dobson*, 2022 WL 2232473, at *2–3 (W.D.N.C. June 21, 2022) (collecting cases demonstrating that a stay pending interlocutory appeal of the denial of sovereign immunity is appropriate given sovereign immunity's protection from suit). From October 2021 to March 2022, the appellate process ran its course: the defendants timely filed briefs (plaintiff asked for and received a seven-day extension), and the Fourth Circuit remanded the case to assess whether Goldman had standing to sue. *Goldman*, 2022 WL 794968, at *1. Back at the district court in March, the defendants filed a fully briefed (and successful) motion to dismiss only 17 days after the Fourth Circuit remanded the case. See *Goldman* ECF Nos. 76. 77.

Litigating in good faith, meeting every Court-ordered deadline (even extremely expedited ones), and exercising statutory rights to file motions and take appeals does not constitute "unclean hands." The unclean hands maxim applies when "some unconscionable act," *Keystone Driller Co.*, 290 U.S. at 245, such as fraud or deceit, precludes equitable relief because a court will not be the "abetter of iniquity," *Bein v. Heath*, 47 U.S. 228, 247 (1848). Lawful and good-faith conduct in

litigation simply cannot provide a foundation for an unclean-hands defense.[18] And Defendants did not somehow prevent Goldman, much less Plaintiffs here, from obtaining relief through delay; Goldman was never entitled to any remedy because he lacked standing, and Plaintiffs were free to file suit at any time.

Finally, the principle of "unclean hands" is irrelevant to the *Purcell* analysis. Unlike laches, the *Purcell* principle is not grounded solely in traditional equitable principles. Rather, its origins are constitutional in nature, and its purpose is to protect the States from federal judicial overreach. "Our constitution does not contemplate that the federal judiciary routinely will pass judgment on particular elections for federal, state or local office." *Hutchinson v. Miller*, 797 F.2d 1279, 1280 (4th Cir. 1986). That is because the Constitution "provides States—not federal judges—the ability to choose among many permissible options when designing elections. And because that's where the decision-making authority is, federal courts don't lightly tamper with election regulations." *Thompson*, 959 F.3d at 812. It follows that the constitutionally grounded prudential rule embodied in the *Purcell* principle is not subject to equitable maxims such as "unclean hands." See *Walen v. Burgum*, 2022 WL 1688746, at *6 (D.N.D. May 26, 2022) (rejecting plaintiffs' "invitation to discount the *Purcell* principle because of perceived delay" by the State, including "the claim that the Defendants delayed this litigation"); see also *Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 228 (4th Cir. 2000) ("Unclean hands bars a party from receiving equitable relief because of that party's own inequitable conduct. [Defendants] do not request equitable relief.

---

[18] Even if the unclean-hands doctrine could apply to this case, Beals and the Department of Elections are incapable of having unclean hands. Beals did not become a party to the *Goldman* litigation until after the Fourth Circuit remanded the case for this Court to decide the Article III standing question, at which point she met every expedited deadline this Court imposed before she prevailed on her jurisdictional defense. See *Goldman II*, 2022 WL 2024745, at *2 n.3; SOF ¶ 27. And the Department of Elections was not a party to the *Goldman* litigation at all. Neither of them can possibly be accused of having unclean hands for acts neither of them committed.

The doctrine of unclean hands therefore does not apply in the present case." (citation omitted)).

### 3. Prudential principles governing the special-election remedy foreclose Plaintiffs' requested relief

In addition to the *Purcell* principle, the Supreme Court has also established prudential limitations on the sort of highly disruptive equitable remedy Plaintiffs seek. In *Covington*, the Court vacated a three-judge district court's order requiring creation of new electoral maps within approximately four months of the November 2016 general election, shortening the terms of all legislators elected in 2016 to one year, and holding a Fall 2017 special election in which elected legislators would also serve one-year terms. 137 S. Ct. at 1625. It held that the district court abused its discretion in undertaking "only the most cursory" equitable weighing process to identify appropriate remedies tailored to the violations it identified, essentially ignoring necessary factors such as "the severity and nature of the particular constitutional violation, the extent of the likely disruption to the ordinary processes of governance if early elections are imposed, and the need to act with proper judicial restraint when intruding on state sovereignty." *Id.* at 1625–26. Under *Covington*, district courts must exercise the utmost restraint when imposing equitable relief that interferes with State sovereignty, such as by ordering special elections and curtailing elected officials' terms. Accordingly, where, as here, the only claims before the Court relate to a past election (the alleged infirmity of which was concededly beyond Defendants' control), *Covington* strongly suggests the extraordinary equitable relief Plaintiffs seek is unavailable. See, *e.g.*, *Walen*, 2022 WL 1688746, at *6 (applying *Covington* to decline to order primary elections two months later because it "would amount to an unprecedented intrusion into a state's wide-ranging authority to administer its own elections").

### CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiffs' claims.

Dated: July 1, 2022                              Respectfully submitted,

SUSAN BEALS
ROBERT H. BRINK
VIRGINIA DEPARTMENT OF ELECTIONS

By:    */s/ Andrew N. Ferguson*
       Andrew N. Ferguson (VSB #86583)
         *Solicitor General*

Jason S. Miyares                   Erika L. Maley (VSB #97533)
   *Attorney General*                 *Principal Deputy Solicitor General*

Charles H. Slemp III (VSB #79742)     Kevin M. Gallagher (VSB #87548)
   *Chief Deputy Attorney General*       Graham K. Bryant (VSB #90592)
                                 *Deputy Solicitors General*

Steven G. Popps (VSB #80817)
   *Deputy Attorney General*           Rohiniyurie Tashima (VSB #97248)
                                 *John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704 – Telephone
(804) 371-0200 – Facsimile
AFerguson@oag.state.va.us

41

## <u>CERTIFICATE OF SERVICE</u>

THIS IS TO CERTIFY that on July 1, 2022, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system. A true copy was also sent, via email pursuant to an

agreement between the parties, to:

Jeffrey Thomas, Jr.
301 Virginia St. Unit 1514
Richmond, VA 23219

Michelle C. Thomas
43720 Red House Drive
Landsdowne, VA 20176

Phillip E. Thompson
43709 Mahogany Run Court
Leesburg, VA 20176

*Pro se Plaintiffs*

      */s/ Andrew N. Ferguson*
Andrew N. Ferguson (VSB #86583)
*Counsel for Defendants*

42