IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

JEFFREY THOMAS, JR., *et al.*,
   *Pro se* Plaintiffs,

   v.                                  Civil No. 3:22cv427 (DJN)

SUSAN BEALS *et al.*,
   Defendants.

## **MEMORANDUM OPINION**

*Pro se* Plaintiffs Jeffrey Thomas, Jr., Michelle C. Thomas and Phillip E. Thompson (collectively, "Plaintiffs") bring this case against Susan Beals, Robert Brink and the Virginia Department of Elections ("VDOE") (collectively, "Defendants"), alleging violations of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("VRA") in conducting the 2021 House of Delegates election.

Like just about everything else in our society, the unprecedented COVID-19 global pandemic impacted the work of the United States Census Bureau, delaying the sending of the results of the 2020 Census to the states. As a result, Virginia's newly established Redistricting Commission could not reapportion the districts for the House of Delegates in time for the election on November 2, 2021. Ultimately, the Supreme Court of Virginia drew new maps, but it could not complete them until December 28, 2021. Consequently, Virginia conducted the 2021 election using maps that this Court had redrawn in 2019 using data from the 2010 Census, which Plaintiffs allege unconstitutionally diluted their votes. Plaintiffs blame Defendants for this dilution and, after waiting seven months after the election to file suit, seek an extraordinary

remedy by asking the Court to dissolve the House of Delegates and order a statewide election —
including certification of candidates, ballot preparation, conducting primaries, absentee voting
and the multitude of other required election mechanics — to occur in just three months. This
matter comes before the Court on Defendants' Motion to Dismiss the Amended Complaint
Under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 24.) For the reasons
stated herein, the Court will GRANT Defendants' Motion and DISMISS Plaintiffs' claims,
because Plaintiffs cannot trace their injuries to Defendants' conduct and the Court cannot redress
Plaintiffs' alleged injury. Thus, Plaintiffs lack standing to bring their suit.

## I.     STANDARD OF REVIEW

A motion made pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges a court's
jurisdiction over the subject matter of the complaint. Fed. R. Civ. Proc. 12(b)(1). When a
defendant makes a facial challenge to subject matter jurisdiction under Rule 12(b)(1) but does
not dispute the jurisdictional facts in the complaint, a court will treat the motion similar to a
motion made for failure to state a claim under Rule 12(b)(6) and accept only the facts alleged in
the complaint as true. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

Alternatively, if the defendant disputes the jurisdictional facts in the complaint, "the
Court may 'look beyond the jurisdictional allegations of the complaint and view whatever
evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction
exists.'" *Virginia v. United States*, 926 F. Supp. 537, 540 (E.D. Va. 1995) (quoting *Capitol
Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir.1993)); *see also Adams v. Bain*, 697 F.2d 1213,
1219 (4th Cir. 1982) (explaining that a court may go beyond factual allegations in the complaint
for factual attacks on subject matter jurisdiction). By that same token, a court may consider
evidence outside of the pleadings without converting the motion to one for summary judgment.

2

*Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation omitted). In either case, the plaintiff bears the burden of proof to invoke jurisdiction. *Id.* (citation omitted). Here, the parties do not dispute the dispositive facts, as the parties have filed a Stipulation of Facts that provides a sufficient evidentiary basis for resolution of the issue. (Stipulation of Facts ("Stip.") (ECF No. 21)). With these standards in mind, the Court now turns to the factual and procedural background giving rise to this case.

## II. BACKGROUND

### A. Factual Background

#### 1. The parties

Plaintiff Jeffrey Thomas, Jr. resides in Richmond, Virginia. (Stip. ¶ 5.) At the time of the 2021 election, he was a registered voter in House District 71. (Stip. ¶ 2.) He voted in the 2021 election. (Stip. ¶ 4.) Under the new 2021 maps, he now resides in House District 78. (Stip. ¶ 3.)

Plaintiff Michelle Thomas, an African American, resides in Leesburg, Virginia. (Stip. ¶¶ 14, 17.) At the time of the 2021 election, she was a registered voter in House District 32. (Stip. ¶ 10.) She voted in the 2021 election. (Stip. ¶ 12.) Under the new 2021 maps, she now resides in House District 29. (Stip. ¶ 11.)

Plaintiff Thompson, an African American, also resides in Leesburg, Virginia. (Stip. ¶¶ 23, 26.) At the time of the 2021 election, he was a registered voter in House District 10. (Stip. ¶ 19.) Under the new 2021 maps, he also now resides in House District 29. (Stip. ¶ 20.)

Defendant Beals serves as the Commissioner of the Virginia Department of Elections, serving in that role since March 2022. (Stip. ¶ 27.) Defendant Brink serves as the Chairman of the Virginia State Board of Elections. (Stip. ¶ 28.)

### 2.   *The 2021 redistricting process*

COVID-19 delayed the 2021 redistricting process, which should have occurred as

follows. By statute, the United States Secretary of Commerce was to deliver the apportionment

reports from the 2020 Census to the President of the United States by December 31, 2020.

(Stip. ¶ 29.)  The Secretary of Commerce did not deliver those reports to the President until April

26, 2021. (Stip. ¶ 29.)  The United States Census Bureau was statutorily required to deliver

2020 Census data to the states for redistricting purposes by April 1, 2021. (Stip. ¶ 30.)  On

February 12, 2021, however, the Census Bureau stated that it would not be able to deliver

the data until as late as September 30, 2021, due to delays in census operations caused by the

COVID-19 pandemic. (Stip. ¶ 30.)

On August 12, 2021, the United States Census Bureau released the 2020 Census data,

and the Virginia Redistricting Commission hired an outside consultant to perform

significant reformatting of those files so that the Redistricting Commission could use them

to draw district lines. (Stip. ¶ 31.)  On August 16, 2021, the Redistricting Commission voted

to begin the redistricting process on August 26, 2021 — the date on which it anticipated that

it would receive reformatted files from the outside consultant. (Stip. ¶ 32.)  On August 26,

2021, the consultant provided the Redistricting Commission with the reformatted files.

(Stip. ¶ 33.)

Between August 17, 2021, and October 20, 2021, the Commission met eighteen times to

develop redistricting plans. (Stip. ¶ 34.)  On October 24, 2021, the responsibility for creating

new electoral districts for the House of Delegates transferred from the Commission to the

Supreme Court of Virginia, pursuant to Article II, § 6-A of the Constitution of Virginia, because

the Redistricting Commission had not presented plans for the House of Delegates and Senate

4

districts to the General Assembly by the statutory deadline.  (Stip. ¶ 35.)  The 2021 House of

Delegates election was held on November 2, 2021, based on the House of Delegates electoral

districts in place at that time.  (Stip. ¶ 36.)  Pursuant to the Constitution of Virginia, members of

the House of Delegates elected in 2021 will serve a term of two years.  Va. Const. art. IV, § 3.

The Supreme Court of Virginia completed the congressional and state legislative redistricting

plans on December 28, 2021.  (Stip. ¶ 37).

### 3.      *The 2022 general election*

The 2022 Virginia general election, which will include elections for the United States

Congress, will take place on November 8, 2022.  (Stip. ¶ 38.)  Virginia candidates seeking

election in November 2022 could start collecting petition signatures to qualify as candidates

after January 1, 2022.  (Stip. ¶ 39.)  2022 Candidates who intended to compete in primaries

had to file their qualification paperwork by April 7, 2022.  (Stip. ¶ 40.)  The statewide

primary for the two major parties recognized by state law took place on June 21, 2022.

(Stip. ¶ 41.)  Pursuant to federal and state law, absentee voting for the November 2022

general election must begin no later than September 24, 2022.  *Goldman v. Brink*, 2022 WL

2024745, at *4 (E.D. Va. June 6, 2022) ("*Goldman II*"), *aff'd* __ F.4th __, 2022 WL

2866015 (4th Cir. 2022).  The House of Delegates has no primary or general election

contests scheduled for 2022.  *Id.*  The next House of Delegates general election is scheduled

to occur in 2023.  (Stip. ¶ 42.)

### 4.    *The apportionment of House of Delegates Districts*

#### a.    *Apportionment of the population of Virginia, according to the 2010 census, among the House of Delegates districts defined in 2011*

According to the 2010 Census, Virginia had a total population of 8,001,024, making the

average population (the "ideal population" or "ideal district") of the 100 House of Delegates

districts 80,010.  (Stip. ¶ 43.)  Following the 2010 Census, the General Assembly drew the 100

House of Delegates districts to take effect beginning with the 2011 election cycle.  *Bethune-Hill*

*v. Va. State Bd. of Elec.*, 326 F. Supp. 3d 128, 137 (E.D. Va. 2018) ("*Bethune-Hill I*").  These

included 12 majority-minority districts.  *Id.* at 138.  The General Assembly passed the bill with

the new maps in April 2011, Governor McDonnell signed the bill into law and the Department of

Justice precleared the plan in accordance with Section 5 of the VRA.  *Id.* at 138-39.  In 2014,

registered voters in the twelve majority-minority districts filed suit, challenging their districts as

racial gerrymanders in violation of the Equal Protection Clause.  *Id.* at 139.  The House of

Delegates and its speaker at the time intervened and thereafter bore the primary responsibility of

defending the 2011 plan.  *Id.*

A three-judge panel of this Court conducted a bench trial in July 2015 and found that race

did not predominate in the construction of 11 of the 12 challenged districts.  *Id.*  The Supreme

Court disagreed with the predominance analysis, explaining that the Court had not considered all

of the ways that Plaintiffs could show that race predominated in the construction of the districts.

*Bethune-Hill v. Va. State Bd. of Elec.*, 137 S. Ct. 788, 799-800 (2017).  On remand, the Court

found that the 11 remaining challenged districts violated the Equal Protection Clause and

allowed the Virginia General Assembly to construct a remedial plan that rectified the

constitutional deficiencies.  *Bethune-Hill I*, 326 F. Supp. 3d at 180-81.  It did not order a special

6

election to occur on the new maps, despite the fact that it rendered its decision during the middle of a term of the House of Delegates that had been elected under unconstitutional maps.

The General Assembly failed to enact new plans. *Bethune-Hill v. Va. State Bd. of Elec.*, 368 F. Supp. 3d 872, 873 (E.D. Va. 2019) ("*Bethune-Hill II*"). Accordingly, the Court appointed a special master to assist it in preparing a remedial plan. *Id.* at 873-74. The parties and other non-parties submitted a total of seven plans for consideration. *Id.* at 875. The Court ultimately adopted a plan proposed by the special master, which included changes to 25 of the 100 districts drawn by the General Assembly in 2011. *Id.* at 881, n.12. The Court ordered the General Assembly to implement the plan for use in the 2019 House of Delegates elections. As described more fully below, the only relevant changes that have occurred since the Court redrew the maps for the 2019 election are that the 2020 Census quantified the population growth in Virginia since the 2010 Census and the COVID-19 pandemic delayed the 2020 Census.

The House of Delegates districts defined by the General Assembly in 2011 and redrawn by this Court in 2019 were apportioned using population data from the 2010 census ("2011 Districts"). (Stip. ¶ 44.) The Stipulation contains the 2010 Census population for each 2011 District, including the districts in which each Plaintiff voted. (Stip. ¶ 44.) 2011 District 71, Plaintiff Jeffrey Thomas Jr.'s district, had a population of 79,920 in 2010. (Stip. ¶ 44.) 2011 District 32, Plaintiff Michelle Thomas' district, had a population of 80,268 in 2010. (Stip. ¶ 44.) Finally, 2011 District 10, Plaintiff Thompson's district, had a population of 80,617 in 2010. (Stip. ¶ 44.)

### b.   *Apportionment of the population of Virginia, according to the 2020 Census, among the House of Delegates districts defined in 2011*

According to the 2020 Census, the total population of Virginia grew to 8,631,393 (an increase of 7.9%), making the ideal House district population 86,314. (Stip. ¶ 45.)  Based on the 2020 Census data, 2011 House District 71 — Plaintiff Jeffrey Thomas, Jr.'s district — had an adjusted population of 94,095. (Stip. ¶ 46.)  According to the Redistricting Commission, the post-*Bethune Hill* demographics of 2011 House District 71 are:  59% Black; 34.7% White; 4.0% Asian; 2.5% Hispanic; 0.9% multiple races; 0.5% American Indian or Alaska Native; and 0.1% Hawaiian Pacific Islander. (Stip. ¶ 49.)  Plaintiff Michelle Thomas' district — 2011 House District 32 — had an adjusted population of 101,629. (Stip. ¶ 47.)  2011 House District 10 — Plaintiff Thompson's district — had an adjusted population of 104,692. (Stip. ¶ 48.)  The least populated 2011 House District, District 75, had a population of 67,404. (Stip. ¶ 50.)  The most populated 2011 House District, District 87, had a population of 130,192. (Stip. ¶ 51.)

### c.   *Apportionment of the population of Virginia, according to the 2020 Census, among the House of Delegates districts defined in 2021*

The Supreme Court of Virginia apportioned the 100 House of Delegates districts defined by the Supreme Court of Virginia in 2021 using population data from the 2020 census. (Stip. ¶ 57.)  2021 House District 78, where Plaintiff Jeffrey Thomas, Jr. resides, has a population of 87,774, according to the 2020 Census. (Stip. ¶ 54.)  2021 House District 29, where Plaintiffs Michelle Thomas and Phillip Thompson reside, has a population of 87,418, according to the 2020 Census. (Stip. ¶ 57.)   2021 House District 27 constitutes the least populated 2021 House district, with a population of 84,213. (Stip. ¶ 55.)  2021 House District 75 constitutes the most populated 2021 House District, with a population of 88,463. (Stip. ¶ 56.)

8

### B.   The *Goldman* Litigation

Before Plaintiffs filed the instant suit, the Court presided over a similar challenge to the Commonwealth's use of the 2011 maps in the 2021 House of Delegates election.[1]  Because the events of that litigation form the backdrop of the instant case, the Court will review the history of the *Goldman* action.

On June 28, 2021, Paul Goldman filed his original complaint, alleging violations of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Article II, §§ 6 and 6-A of the Virginia Constitution.  (Goldman ECF No. 1.)  On July 6, 2021, Goldman filed an amended complaint (Goldman ECF No. 3), which Defendants[2] moved to dismiss for lack of jurisdiction and failure to state a claim.  (Goldman ECF No. 12).  In that motion, Defendants challenged Goldman's standing, because the election had not yet occurred, meaning Goldman had not suffered an injury.  (Goldman ECF No. 13.)

On September 10, 2021, the Court granted Goldman's request to amend his complaint again.  (Goldman ECF Nos. 16-17.)  Defendants again moved to dismiss the second amended complaint on the basis that sovereign immunity barred Goldman's suit.  (Goldman ECF Nos. 23-24.)  Defendants abandoned their previous challenge to Goldman's standing.  (Goldman ECF No. 24.)  Due to the rapidly approaching House of Delegates election, the Court ordered expedited briefing on the motion to dismiss.  (Goldman ECF No. 25.)

---

[1]     *Goldman v. Brink, et al.*, Case No. 3:21cv420.  The Court will refer to entries on the docket for that case as "Goldman ECF No. __."

[2]     Goldman also sued Beals and Brink, the named individual defendants here, in addition to other similar defendants.  Because of the overlap, and because the differences in the other defendants do not bear on the instant analysis, the Court will refer to the defendants in both collectively as "Defendants."

In the interim, prospective plaintiff Joshua Stanfield filed a Motion for Joinder (Goldman ECF No. 22), and then a Motion to Intervene (Goldman ECF No. 29) in the *Goldman* case. The Court denied both motions on October 7, 2021. (Goldman ECF Nos. 31, 32.) Thus, as of the time of the hearing on Defendants' motion to dismiss, Goldman constituted the only plaintiff in that case.

On October 8, 2021, the Court *sua sponte* ordered Defendants to address several questions, including whether they intended to challenge Plaintiff's standing. (Goldman ECF No. 34.) In response, Defendants argued that Plaintiff lacked standing, but not because Plaintiff resided in an underpopulated district. (Goldman ECF No. 38.) Although Defendants responded to the Court's order that Goldman lacked standing, Defendants did not move to dismiss the case for lack of standing.

On October 12, 2021, the Court conducted a hearing on the motion to dismiss. (Goldman ECF No. 39.) During the hearing, the Court dismissed the claims under the Constitution of Virginia and dismissed all claims against Governor Northam and the Board of Elections on sovereign immunity grounds. (Goldman ECF No. 41.) The Court denied the motion to dismiss as to the federal claims against the other defendants (Goldman ECF No. 41), and issued an opinion in support of its Order. *Goldman v. Northam*, 566 F. Supp. 3d 490 (E.D. Va. 2021) ("*Goldman I*") (Goldman ECF No. 40).

During the hearing, the Court also again raised the issue of standing, noting its serious concerns about Plaintiff Goldman's standing. (Tr. of Oct. 12 Hr'g (Goldman ECF No. 43) at 4:9-11.) Defendants then attempted to raise an oral motion on standing. (Tr. of Oct. 12 Hr'g at 20:12-14.) Rather than ruling on the important standing issue on an oral motion, the Court set a briefing schedule for Defendants to file a motion to dismiss on standing. (Tr. of Oct. 12 Hr'g at

10

32-33, 37:11-15; Goldman ECF No. 41.) Defendants then asked for 48 hours to decide whether to file a notice of appeal of the denial of the sovereign immunity motion to dismiss, but the Court gave them six days. (Tr. of Oct. 12 Hr'g at 34:16; 36:4-6.) The Court then set a briefing schedule to address Goldman's standing and scheduled a hearing on the issue for November 8, 2021. (Tr. of Oct. 12 Hr'g at 38-41.) Defendants requested that, if they decided to appeal, the Court stay the case before the deadline for them to file their supplemental motion to dismiss addressing Goldman's standing. (Tr. of Oct. 12 Hr'g at 37:25-38:2.)

On October 15, 2021, Plaintiff Jeffrey Thomas, Jr. filed a Motion to Intervene in the *Goldman* litigation. (Goldman ECF No. 45.) He recognized that Goldman lived in an underpopulated district. (Goldman ECF No. 45 ("First, both Goldman and Stanfield live in districts whose populations according to the 2020 Census data provided by the Virginia Redistricting Commission are lower than the mean average House of Delegates district population, not higher, as HD 71 is.")). Plaintiff Thomas attached to his Motion to Intervene a draft complaint that substantially mirrored the allegations contained in the complaint that he ultimately filed in this case. (ECF No. 45-3.)

Instead of moving to dismiss based on standing, Defendants filed a notice of appeal of the Court's ruling on sovereign immunity. (Goldman ECF No. 47.) Because of the interlocutory appeal, the Court stayed the *Goldman* action, as requested by counsel for Defendants; thereby, precluding the hearing on standing that the Court had scheduled for November 8, 2021. (Goldman ECF No. 49.) Despite having thwarted this Court's ability to address Goldman's standing, counsel for Defendants then challenged Goldman's standing on appeal in addition to challenging the sovereign immunity ruling, rather than moving the Fourth Circuit to remand the case back to this Court to address standing. (Br. of Appellants at 25-30, *Goldman v. Brink*, Case

11

No. 21-2180 (4th Cir.) (ECF No. 10).)  During oral argument on March 8, 2022, the Fourth

Circuit only addressed Goldman's standing.  Thereafter, on March 15, 2022, the Fourth Circuit

remanded the case to this Court to resolve the question of Goldman's standing.  (Goldman ECF

No. 60.)

On March 24, 2022, Jeffrey Thomas, Jr. filed a Notice of Intent to File Separate Lawsuit

and Request for Joinder.  (Goldman ECF No. 71.)  In it, he recognized that "the window of time

to order constitutional elections is closing fast."  (Goldman ECF No. 71 at 4.)  He also

recognized that the Court's resolution of Goldman's standing could further delay that action,

even though he "could separately file the Complaint [] today." (Goldman ECF No. 71 at 4.)  Yet,

he waited to file his lawsuit until after the resolution of Goldman's suit.

Following remand from the Fourth Circuit, the Court then set an expedited briefing

schedule and, ultimately, on June 6, 2022, dismissed Goldman's case on the basis that he lacked

standing.  (Goldman ECF Nos. 69, 89.)  Because the Court lacked jurisdiction over the subject

matter of the *Goldman* action, there existed no case to which Plaintiff Thomas, Jr. could

intervene and, therefore, the Court denied his motion to intervene as moot.  (Goldman ECF No.

89.)  Goldman appealed the dismissal (Goldman ECF No. 91), and the Fourth Circuit

consolidated the appeal with Defendants' appeal of the sovereign immunity decision.

On July 21, 2022, in a published opinion, the Fourth Circuit affirmed the dismissal of

Goldman's suit for lack of standing without hearing argument on the appeals.  *Goldman v. Brink*,

__ F.4th __, 2022 WL 2866015 (4th Cir. 2022).  Because the Court lacked subject matter over

the entire action, the Fourth Circuit also vacated the Court's previous ruling on sovereign

immunity (*Goldman I*).  *Id.* at *2.  Further, the Fourth Circuit directed the Clerk "to forthwith

issue the mandate resolving these consolidated appeals."  *Id.* at *3.

## C.    Procedural History

Despite filing his notice of his intent to file a separate lawsuit in the *Goldman* litigation in March, Plaintiff Jeffrey Thomas, Jr. initiated this lawsuit on June 8, 2022, by filing a Petition for a Writ of Mandamus.  (ECF No. 1.)  Because he requested expedited consideration of his case, the Court held a status hearing on June 13, 2022.  (ECF No. 8.)  During the hearing, the Court set an expedited briefing schedule for any motions that Defendants would raise and included a deadline for the parties to file an agreed statement of stipulated facts.  (ECF No. 10.)  The day before the first deadline in the schedule, Plaintiff filed an Amended Complaint, adding two new plaintiffs, a new defendant and a new cause of action.  (ECF No. 14.)  This required the Court to extend the deadlines in the briefing schedule, further delaying the case.  (ECF No. 16.)

### 1.    *Plaintiffs' Amended Complaint*

In the Amended Complaint, Plaintiffs allege that they all live in House Districts that, according to the 2020 Census data, have populations that now exceed the ideal district.  (Am. Compl. ¶¶ 19, 34, 50.)  They allege that they and other voters and residents in their Districts "have had their voting strength and political representation unconstitutionally diluted or weakened by the failure of Defendants to conduct, enact, or oversee decennial constitutional reapportionment, redistricting, or elections."  (Am. Compl. ¶ 54.)

Plaintiffs further allege a 93.2% disparity between the largest and smallest 2011 House Districts based on the 2020 Census data.  (Am. Compl. ¶ 16.)  They allege that this disparity exceeds the constitutional bounds set forth by the Supreme Court in *Reynolds v. Sims*, 377 U.S. 533 (1964) and its progeny.  Plaintiffs allege that the populations in the House Districts under the new 2021 maps fall within constitutional limits.  (Am. Compl. ¶¶ 67-72.)

In Count One, Plaintiffs allege that "Defendants' failure to facilitate, timely adopt or oversee the required constitutional elections, redistricting or reapportionment of the Virginia House of Delegates violates the Equal Protection Clause of the Fourteenth Amendment by causing Plaintiffs and all other similarly situated voters to be underrepresented in the House of Delegates by a factor of 39.6%, 50.8% and 55.3%, respectively, compared to other voters in less populous districts in Virginia." (Am. Compl. ¶ 102.) Plaintiffs further claim that "Defendants and/or others in Virginia government deliberately conducted unconstitutional elections in 2021 for two-year House of Delegates terms." (Am. Compl. ¶ 106.)

In Count Two, Plaintiffs allege that the deviations "violate the constitutional rights of Plaintiffs and every racial minority voter in Plaintiffs' districts to have their votes counted equally through their representatives elected to the General Assembly." (Am. Compl. ¶ 113.) As a result, they have suffered a violation of the Voting Rights Act of 1965. (Am. Compl. ¶ 111.)

As a remedy, Plaintiffs request the relief granted by the Court in *Cosner v. Dalton*, 522 F. Supp. 350 (E.D. Va. 1981). Specifically, Plaintiffs request that the "Court order House of Delegates primary elections to be held on or before September 13, 2022," and for "general elections to be held under constitutional maps at the time of the November 2022 general elections." (Am. Compl. at 16, Prayer for Relief.)

On July 1, 2022, Defendants filed their Motion to Dismiss. They argue that Plaintiffs lack standing, because they do not seek a remedy that can redress their alleged injury. (Defendants' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") (ECF No. 25) at 8.) Specifically, Defendants claim that Plaintiffs only allege an injury that occurred entirely in the past, because the 2021 election has already occurred. (Defs.' Mem. at 8-10.) Thus, a special

14

election would not remedy that injury.  (Defs.' Mem. at 8-10.)  Further, Defendants argue that Plaintiffs do not allege that Defendants bear responsibility for the delayed census data.  (Defs.' Mem. at 11-12.)  For the same reasons, Defendants claim that sovereign immunity bars Plaintiffs' claims.  (Defs.' Mem. at 12.)  Specifically, because the *Ex parte Young* exception to sovereign immunity only applies to remedy an ongoing injury, Plaintiffs' claims do not fit that exception.  (Defs.' Mem. at 12-17.)

Additionally, Defendants attack the merits of Plaintiffs' claims, arguing that they have not stated a claim for relief.  (Defs.' Mem. at 18.)  Defendants aver that the Equal Protection Clause does not require states to reapportion every ten years before new census data becomes available.  (Defs.' Mem. at 18-24.)  With respect to Plaintiffs' claims under the VRA, Defendants argue that Plaintiffs have not pled any of the elements of a VRA claim.  (Defs.' Mem. at 25-27.)  Additionally, Plaintiff Jeffrey Thomas has not pled his race, dooming his VRA claim.  (Defs.' Mem. at 27.)  Further, Defendants argue that laches bars Plaintiffs' claims, because they have delayed bringing their suit.  (Defs.' Mem. at 28-32.)  Finally, Defendants argue that the principle stemming from the Supreme Court's decision in *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), wherein federal courts must abstain from interfering in an election in the period close to an election, counsels against granting Plaintiffs the relief that they seek. (Defs.' Mem. at 33-36.)

On July 11, 2022, Plaintiffs filed their Opposition to Defendants' Motion to Dismiss. (("Pl.'s Resp.") (ECF No. 26).)  In it, they argue that the Court's decision in *Goldman* forecloses the arguments raised by Defendants here.  (Pls.' Resp. at 2.)  Specifically, Plaintiffs argue that they have standing, because they reside in overpopulated districts, unlike Goldman.  (Pls.' Resp.

at 3-4.)  With respect to sovereign immunity, Plaintiffs claim that the Court has already found
Defendants to be proper parties.  (Pls.' Resp. at 5.)

In response to Defendants' merits arguments, Plaintiffs argue that the disparity statistics
alone demonstrate a constitutional violation.  (Pls.' Resp. at 6.)  They claim that the Court can
and must grant the relief found in *Cosner*.  (Pls.' Resp. at 7.)  Further, they claim that the state
has the ability to conduct a statewide special election, because it recently conducted a special
election in a single district on a month's notice.  (Pls.' Resp. at 5-6.)  With respect to Defendants'
laches and *Purcell* arguments, Plaintiffs lay the blame for the delay at the feet of Defendants,
claiming that their litigation tactics in *Goldman* caused the delay, and that they have followed the
Court's orders in attempting to vindicate their voting rights.  (Pls.' Resp. at 8-12.)

On July 15, 2022, Defendants filed their reply (ECF No. 27), rendering this matter ripe
for review.[3]

## III.    ANALYSIS

The Court will first address whether the Court as a single judge may decide Defendants'
Motion to Dismiss or whether a three-judge court must do so.  Thereafter, the Court will
determine whether Plaintiffs have standing to proceed with their lawsuit.

### A.    Composition of the District Court

In their Amended Complaint, Plaintiffs request a three-judge panel.  (Am. Comp. at 13.)
Defendants argue that a single judge may decide the jurisdictional defenses that they raise,
including standing and sovereign immunity, but that a three-judge panel must decide the merits

---

[3]    The Court dispenses with oral argument, because the materials before it adequately
present the facts and legal contentions, and argument would not aid in the decisional process.

defenses that they raise, including failure to state a claim, laches and the *Purcell* principle. (Defs.' Mem. at 8 n.3.)

> Section 2284(a) of Title 28 provides that a three-judge district court:

> shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.

Under that statute, when a party requests a three-judge court, the presiding judge must first determine whether the appointment of a three-judge panel is necessary, and if so, notify the chief judge of the circuit, who appoints the other members of the panel. § 2284(b)(1). The statute also permits "[a] single judge [to] conduct all proceedings except the trial, and enter all orders permitted by the rules of civil procedure" but prohibits him from "enter[ing] judgment on the merits." § 2284(b)(3). The other two judges of the panel may review the action of a single judge at any time before final judgment. *Id.*

Although the statute requires a district court of three judges to be convened in an apportionment challenge, it does not require the appointment of a three-judge court immediately after a party requests one. § 2284(a). The statute empowers the individual judge to whom the request for a panel is presented to first determine whether three judges are required before making such a request of the chief circuit judge. § 2284(b)(1). A three-judge panel need not adjudicate claims that "fail[] to raise a substantial federal question for jurisdictional purposes." *Shapiro v. McManus*, 577 U.S. 39, 45 (2015). Thus, a single judge may review jurisdictional questions, without convening a three-judge panel. *Goldman II*, 2022 WL 2024745, at *7. In cases where a three-judge court has not yet been convened, a single judge may decline to convene a panel and decide jurisdictional issues himself. *Gonzalez v. Automatic Emps. Credit Union*, 419 U.S. 90, 100 (1974). When the chief circuit judge has already appointed the panel,

17

the panel may dissolve itself and allow a single judge to handle jurisdiction. *Id.* Moreover, by allowing for review by the three-judge court of a single judge's actions (such as the resolution of jurisdictional issues), the statute necessarily contemplates a single judge resolving jurisdictional issues. *Goldman II*, 2022 WL 2024745 at *7. As the Supreme Court has explained, "the three-judge-court procedure is not 'a measure of broad social policy to be construed with great liberality.'" *Gonzalez*, 419 U.S. at 98 (citations omitted).

Here, because the Court resolves Defendants' Motion to Dismiss solely on jurisdictional grounds, the Court will not seek appointment of a three-judge panel. Although a three-judge court decided the jurisdictional motion to dismiss in *Goldman*, a three-judge court had already been convened long before Defendants filed that motion. In any event, the Court specifically ruled that it had the ability as a single judge to rule on the motion, but expediency favored having the three-judge court decide the motion. *Goldman II*, 2022 WL 2024745, at *7. These circumstances do not exist here, and the Court will deny Plaintiffs' request for a three-judge court, as this case can be resolved on jurisdictional grounds.

### A. Plaintiffs' Standing

Article III of the Constitution limits federal courts' jurisdiction to "Cases" and "Controversies." U.S. Const. art. III § 2. The case or controversy requirement "ensures that courts exercise power that is judicial in nature," rather than serving as "a forum for generalized grievances." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). To satisfy the case-or-controversy requirement of Article III, Plaintiffs must establish standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). To meet the minimum constitutional requirements for standing, an individual plaintiff must establish three elements: (1) that the plaintiff has sustained an injury in fact; (2) that the injury is traceable to the defendants' actions; and, (3) that the injury likely can

18

be redressed by a favorable judicial decision. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 396 (4th Cir. 2011) (citing *Lujan*, 504 U.S. at 560-61). Accordingly, the Court will examine each requirement in turn.

### 1. Injury

To demonstrate an injury in fact, a plaintiff must suffer an invasion of a legally protected interest that is concrete and particularized to him, as well as being actual or imminent. *Gaston Copper Recycling Corp,* 629 F.3d at 396 (citing *Lujan*, 504 U.S. at 560); *McBurney v. Cuccinelli*, 616 F.3d 393, 410 (4th Cir. 2010). Defendants argue that Plaintiffs have not alleged an injury-in-fact sufficient to confer standing. (Defs.' Mem. at 8.) Specifically, Defendants argue that Plaintiffs have alleged only a past injury to their voting strength in 2021, such that they have no ongoing injury that the Court could redress with injunctive relief. Plaintiffs contend that they continue to suffer an injury due to the ongoing unequal representation in the House of Delegates. (Am. Compl. ¶ 82.) Defendants' argument essentially asks the Court to find that the Equal Protection Clause furthers electoral equality rather than representational equality. However, case law regarding the purpose of the one person, one vote requirement does not support this position.

In *Reynolds*, the Supreme Court stated that "the fundamental principle of representative government in this country is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State." 377 U.S. at 560-61. Later, the Court referred to the "right of a citizen to equal representation and to have his vote weighted equally with those of all other citizens in the election of [representatives]." 377 U.S. at 576. Thus, *Reynolds* suggests that the Equal Protection Clause aims to protect injuries to both voting equality and representational equality.

Generally, this issue arises in vote dilution cases when determining whether to apportion legislative districts based on total population or on the number of eligible voters in each district. To the extent that the twin aims diverge, apportioning based on total population furthers representative equality, because even non-voters may petition their representative. *See Daly v. Hunt*, 93 F.3d 1212, 1223 (4th Cir. 1996) ("This principle [representational equality] ensures that all constituents, whether or not they are eligible to vote, have roughly equal access to their elected representatives to voice their opinions or otherwise to advance their interests."). Conversely, apportionment based on eligible voters furthers voting equality. *Id.* Typically, apportionment will advance both interests, but they may diverge in unique circumstances that include "demographic abnormalities," resulting in large numbers of non-eligible voters in certain districts. *Id.* (referring to a case involving Los Angeles County that included a large number of immigrants ineligible to vote).

In *Daly*, the Fourth Circuit conducted an exhaustive comparison of electoral equality and representational equality. There, the district court had found a violation of the Equal Protection Clause based on the disparities in voting-age populations in districts. 93 F.3d at 1214. The defendants appealed, arguing that the district-court erred in using voting-age population instead of total population as the basis for comparing the districts. *Id.* Thus, the appeal required the Fourth Circuit to examine the policies behind using total population (furthering representational equality) and voting-age population (furthering electoral equality).

First, the Fourth Circuit determined that the Supreme Court's one person, one vote cases did not elevate electoral equality over representational equality. *Id.* at 1225. Next, the court examined the public policy behind each philosophy, concluding that "when all of the aspects of

20

equal representation are considered as a whole, it becomes clear that representational equality is at least as important as electoral equality in a representative democracy." *Id.* at 1226-27.

Finally, the court had to answer the following question: "What, then, should courts do when faced with a situation, such as presented here, where electoral equality and representational equality cannot be achieved simultaneously?" *Id.* at 1227. The court determined that the question constitutes "quintessentially a decision that should be made by the state, not the federal courts." *Id.* This deferment serves "the overriding theme in the Court's prior apportionment cases weighing against judicial involvement." *Id.*

The Supreme Court endorsed this approach in *Evenwel v. Abbott*, 578 U.S. 54 (2016). There, the appellants challenged the "consensus" where, in the "overwhelming majority of cases, jurisdictions have equalized total population, as measured by the decennial census." *Id.* at 60. The Court analyzed the history of one person, one vote, finding much of it "grounded in the principle of representational equality." *Id.* at 66. The Court noted that it had "repeatedly" suggested that "districting based on total population serves *both* the State's interest in preventing vote dilution *and* its interest in ensuring equality of representation." *Id.* at 72. Accordingly, the Court "reject[ed] appellants' attempt to locate a voter-equality mandate in the Equal Protection Clause," holding that states could apportion based on total population. *Id.* at 64, 74. The Court declined to answer the question of "whether . . . States may draw districts to equalize voter-eligible population rather than total population." *Id.* at 75.

These cases demonstrate that the one person, one vote requirement grounded in the Equal Protection Clause furthers representational equality as well as voting equality. Thus, Defendants' argument that Plaintiffs can only claim a past injury to their voting equality fails. Plaintiffs can also assert an injury to their representational equality.

21

Moreover, even if this case law allows states to further voting equality over representational equality, Virginia does not.  In *Daly*, the Fourth Circuit stated that federal courts should defer to a state's policy for apportionment.  93 F.3d at 1227.  Respecting Virginia's choice, as the Court must, results in finding that Virginia seeks to further both electoral and representational authority.  The Constitution of Virginia mandates that every electoral district "shall be so constituted as to give, as nearly as is practicable, representation in proportion to the population of the district."  Va. Const. art. II, § 6.  Moreover, the parties here stipulated to the population figures using total population, as Virginia uses those numbers in redistricting.  *See* Va. Code § 24.2-304.04 ("The whole number of persons reported in the most recent federal decennial census by the United States Bureau of the Census shall be the basis for determining district populations.").  In *Daly*, the Fourth Circuit concluded that, because North Carolina had "specifically chosen total population as its preferred apportionment base," the district court should have deferred to that choice.  Similarly, this Court will defer to Virginia's choice and find that Virginia redistricting policy furthers both representational and voting equality.  93 F.3d at 1227.  Thus, a claimed one person, one vote violation may implicate both past and ongoing injuries.[4]

Consequently, the Court rejects Defendants' attempts to cabin Plaintiffs' claimed injury as one that ceased upon the completion of the 2021 election.  However, merely because Plaintiffs have alleged an injury to their representational equality, it does not necessarily follow that Plaintiffs have standing.

---

[4]     Although the Court need not reach Defendants' sovereign immunity argument, they base it on the same argument that Plaintiffs have suffered only an injury in the past and, therefore, the *Ex parte Young* exception providing for prospective injunctive relief does not apply.  The Court's rejection of that argument in the standing context would translate to the sovereign immunity context, resulting in the same outcome as in *Goldman I*.

### 2.      Traceability

Alleging an injury does not end the standing analysis, as a plaintiff must also establish traceability and redressability.  A plaintiff has standing only if the alleged injury is "fairly traceable to the defendant's allegedly unlawful conduct." *California v. Texas*, 141 S. Ct. 2104, 2113 (2021).  Plaintiffs "bear the burden of . . . showing that the defendant's actual action has caused the substantial risk of harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414, n.5 (2013).

### a.      Independent actions caused Plaintiffs' injuries.

The sequence of events leading to the 2021 election renders Plaintiffs unable to meet their burden on traceability.  Importantly, federal courts lack jurisdiction to redress a plaintiff's injury "that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *see also Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) ("An injury sufficient to meet the causation and redressability elements of the standing inquiry must result from the actions of the respondent, not from the actions of a third party beyond the Court's control.").  Plaintiffs claim as their injury a dilution of their votes stemming from an election held under allegedly unconstitutional maps.  A review of the timeline — as stipulated by the parties — clearly demonstrates that Defendants shoulder none of the blame for any allegedly illegal election.

First, in 2019, following protracted litigation, the Court redrew the districts that the General Assembly had drawn in 2011, based on population data from the 2010 census.  (Stip. ¶ 44; *Bethune-Hill II*.)  During that time, between 2010 and 2020, the population of Virginia grew by 7.9 percent, as revealed by the 2020 Census data.  (Stip. ¶ 45.)

Critically, in March 2020, the COVID-19 pandemic overtook the world and severely affected the functioning of nearly every aspect of life in this country.  It did not spare the 2020 Census and, as a result, it delayed the delivery of the 2020 Census data.  (Stip. ¶¶ 29-30.)  Indeed, the United States Census Bureau should have delivered the 2020 Census data to the states for redistricting purposes by April 1, 2020.  (Stip. ¶ 30.)  But, due to delays in operations caused by the COVID-19 pandemic, the Census Bureau did not deliver the data until August 12, 2021.  (Stip. ¶ 31.)  Moreover, the Commonwealth did not obtain the 2020 Census data in a useable format until August 26, 2021.  (Stip. ¶ 33.)  Absentee voting for the 2021 election began less than a month later, on September 18, 2021.  *Goldman II*, 2022 WL 2024745, at *3.

According to the Constitution of Virginia, the newly established Redistricting Commission had 45 days from the date that they received the census data to submit new district maps to the General Assembly.  Va. Const. art. II, § 6-A(d).  The Redistricting Commission failed to agree upon new district maps, resulting in the Supreme Court of Virginia taking responsibility for the redistricting process on October 24, 2021.  (Stip. ¶ 35.)  Because the Redistricting Commission had not timely completed the redistricting process that the Constitution of Virginia prescribed, the election for the House of Delegates proceeded on November 2, 2021, using the same maps then in place.  (Stip. ¶ 36.)  Ultimately, the Supreme Court of Virginia completed the redistricting plans on December 28, 2021.  (Stip ¶ 37.)

Thus, Virginia's 2021 election using an allegedly unconstitutional court-drawn map resulted from the following events:  (1) Virginia's population grew and shifted; (2) COVID-19 delayed the Census Bureau's delivery of the 2020 Census data to Virginia until less than one month before voting in the 2021 general election began; and, (3) the independent Redistricting Commission failed to present a redistricting plan to the General Assembly before the election.

Clearly, Defendants bear no responsibility for any of these events. Yet, all three of these events caused Plaintiffs' alleged injuries. Indeed, Plaintiffs stipulated to each of these events, as they could not possibly have disputed them. Most importantly, they stipulated that the COVID-19 pandemic delayed the delivery of the 2020 Census data. (Stip. ¶ 31.) This massive global pandemic enveloped the world, shutting down large swaths of government and private life for extended periods of time. Its impact did not spare the 2021 general election. Yet, neither Defendants nor anyone acting on behalf of Virginia shoulder the blame for the delay in the Census data — the main driver of the inability to conduct the 2021 election using new maps. Despite these obvious and stipulated facts, Plaintiffs still try to pin the blame for their alleged injuries on Defendants. Because Plaintiffs' attempt to lay blame on Defendants for the delays caused by the unprecedented pandemic fails, Plaintiffs are unable to trace their injuries to Defendants, as required by Article III.

> **b.    *Defendants' lacked authority to take the actions that Plaintiffs propose.***

Even putting aside the pandemic-related circumstances that caused Plaintiffs' alleged injuries, Plaintiffs cannot trace their injuries to any allegedly unlawful action or inaction by Defendants. Traceability requires a "causal connection between the injury and *the conduct complained of.*" *Lujan*, 504 U.S. at 560 (emphasis added). Accordingly, a plaintiff must trace injuries to particular conduct to establish standing. *See California v. Texas*, 141 S. Ct. 2104, 2128 (2021) (Alito and Gorsuch, J.J., dissenting) ("Tracing injuries to particular conduct ensures that the properly adverse parties are before the court and reinforces the traditional understanding of legal judgments.").

Plaintiffs complain of the following conduct and inaction by Defendants that caused Plaintiffs' alleged dilution:

- Defendants' actions to facilitate or conduct House of Delegates elections under unconstitutional lines in 2021 (Am. Compl. ¶ 80);

- Defendants' refusal to schedule constitutional elections despite their knowledge since December 2021 of constitutional lines drawn by the Supreme Court of Virginia (Am. Compl. ¶ 80);

- Defendants' continual attempts to ensure those unconstitutionally elected politicians are seated for two-year terms (Am. Compl. ¶ 80);

- Defendants' failure to conduct the 2021 House of Delegates elections under constitutional maps (Am. Compl. ¶ 81); and,

- Defendants' refusal to hold House of Delegates elections under constitutional maps until 2023. (Am. Compl. ¶ 81.)

Plaintiffs sum up these allegations as Defendants' "failure to facilitate, timely adopt or oversee the required constitutional elections, redistricting or reapportionment of the Virginia House of Delegates." (Am. Compl. ¶¶ 102-03, 112.) However, Defendants completely lacked the ability to take some of these actions. For example, Defendants could not have conducted the 2021 House of Delegates elections under different maps, as no other maps existed. As discussed above, the COVID-19 pandemic and Virginia's new redistricting process precluded the adoption of any new maps until December 2021, after the November election.

Moreover, Defendants lacked the authority to take most of these actions, precluding the argument that Plaintiffs can trace their injuries to Defendants. *See Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957-58 (8th Cir. 2015) (finding lack of traceability when defendants lacked authority to enforce the complained-of statute). Defendants have no authority to schedule new elections, as the Constitution of Virginia vests that power in the General Assembly: "The General Assembly shall provide for the nomination of candidates, shall regulate the time, place, manner, and administration of primary, general, and special elections." Va. Const. art. II, § 4. Likewise, Defendants lack the authority to draft new maps, as the Virginia

26

Constitution provides a detailed process involving a redistricting commission and potentially the Supreme Court of Virginia. Va. Const. art. II, § 6-A.

Furthermore, Plaintiffs' claim that Defendants should have ordered new elections under new maps, effectively commuting the terms of the members of the House of Delegates from two years to one year, is unavailing. This solution would have contravened at least two provisions of the Constitution of Virginia. First, the Constitution of Virginia provides that members of the House of Delegates serve two-year terms, as they "shall be elected biennially by the voters of the several house districts on the Tuesday succeeding the first Monday in November." Va. Const. art. IV, § 3. Thus, declaring another election one year after the election of the members of the House of Delegates would contravene the Constitution of Virginia's mandate that the voters elect Delegates every two years. Second, the Constitution of Virginia provides that:

> "A member in office at the time that a decennial redistricting law is enacted shall complete his term of office and shall continue to represent the district from which he was elected for the duration of such term so long as he does not move his residence from the district from which he was elected."

Va. Const. art. II, § 6. Thus, the Constitution of Virginia contemplates the adoption of new maps during the term of the House of Delegates, but provides that such an adoption will not trigger a new election.

Plaintiffs allege that the Court in *Goldman* already found these Defendants "to be the proper Defendants in their official capacities." (Am. Compl. ¶ 83.) However, the Court made no such finding that would apply to the standing analysis in this case. Defendants had raised only a sovereign immunity challenge at that point and had not yet challenged standing. Instead, the Court found that, for the sake of an exception to the *Ex parte Young* doctrine that generally prohibits suits against state officials, Defendants had the ability to enforce the state's election laws. *Goldman v. Northam*, 566 F. Supp. 3d 490, 508 (E.D. Va. 2021) ("*Goldman I*"). Thus, if

27

the Court had stepped into the shoes of the General Assembly and ordered the State to conduct a

new election, Defendants would have had the ability and responsibility to carry out that order.

The Court did not find that Defendants had caused any injuries, nor that they had the authority or

responsibility to carry out a special election absent an order from the General Assembly or the

Court, such that they could bear responsibility for refusing to conduct a special election absent

such an order.

In sum, the Court finds that, as stipulated by the parties, the injuries alleged by Plaintiffs

occurred as a result of forces entirely beyond Defendants' control.  Further, Defendants lacked

the authority to take those actions to prevent or ameliorate the alleged injuries, and the actions

would have contravened the Constitution of Virginia.  Accordingly, Plaintiffs have failed to

allege that their injuries can be fairly traced to the conduct of Defendants.  Without traceability,

the Court lacks subject matter jurisdiction over Plaintiff's suit, regardless of whether Plaintiffs

can satisfy the injury and redressability prongs of standing.  *See Valley Forge Christian Coll. v.*

*Ams. United for Separation of Church & State*, 454 U.S. 464, 491 (1982) (Brennan, J. dissenting)

("The Constitution requires an Article III court to ascertain that both requirements [injury and

traceability] are met before proceeding to exercise its authority on behalf of any plaintiff,

whether the form of relief requested is equitable or monetary.").  Nevertheless, the Court will

address the redressability requirement of standing.

### 3.      *Redressability*

Even if Plaintiffs could trace their alleged injuries to Defendants' actions, the Court

cannot redress those injuries.  In addition to an injury traceable to the defendant's conduct, a

plaintiff must also show that "the injury will be redressed by a favorable decision." *Lujan*, 504

U.S. at 561.  "[T]he redressability prong entails that it must be likely, and not merely speculative,

that a favorable decision will remedy the injury." *Friends of the Earth, Inc.*, 204 F.3d at 154. In assessing redressability, a federal court "assumes the merits of a dispute will be resolved in favor of the party invoking [its] jurisdiction." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011). But, it still must involve something greater than an "ingenious academic exercise in the conceivable." *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 688 (1973).

First, federal courts lack authority to grant the relief that Plaintiffs seek in these circumstances. Second, to the extent that the Court theoretically could order the special election that Plaintiffs seek, such an extreme remedy is entirely inappropriate in these circumstances, to the point of rendering it unavailable. Indeed, the *Purcell* principle precludes the Court's ability to redress Plaintiffs' injuries in the manner that they seek. Thus, Plaintiffs lack standing to press these claims.

### a.    *Plaintiffs seek relief beyond what a federal court can grant.*

In addressing the redressability component, the Court first notes the extraordinary form of relief that Plaintiffs request. Plaintiffs request that the Court enter an order requiring the Commonwealth of Virginia to conduct a previously unscheduled statewide election for all 100 seats in the House of Delegates using the new maps. This would effectively overturn the results of a proper election and dissolve the current House of Delegates, commuting the terms of the duly elected Delegates from two years to one. Such a commutation by an unelected judiciary would disregard the will of the voters, who elected the Delegates to two-year terms. Plaintiffs seek this extraordinary remedy despite having waited until seven months after the election to file their lawsuit seeking to overturn its results. Yet, they knew of their alleged injuries as early as August of 2021, when the 2020 Census data was released. By waiting until seven months after

the election to file suit — in fact, well after one of the two sessions of the General Assembly to which the voters elected the Delegates to serve — they have rendered the relief that they seek even more extreme. This extreme remedy goes well beyond what the Court ordered in *Cosner*, as the Court ordered a special election to occur in 1982 before the general election in 1981. 522 F. Supp. at 364. Voters in the 1981 election knew the candidates would only serve one year. Thus, the remedy did not have the effect of dissolving the House of Delegates and commuting the terms of the Delegates.

By seeking such an extreme alteration of the status quo, Plaintiffs' request amounts to a mandatory injunction rather than a prohibitory injunction. *League of Women Voters v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) ("Whereas mandatory injunctions alter the status quo, prohibitory injunctions aim to maintain the status quo . . . ."). And, federal courts have long recognized that a "mandatory injunction, like a mandamus, is an extraordinary remedial process, which is granted, not as a matter of right, but in the exercise of a sound judicial discretion." *Morrison v. Work*, 266 U.S. 481, 490 (1925) (internal citations omitted); *Steves and Sons, Inc. v. JELD-WEN, Inc.*, __ F. Supp. 3d __, 2020 WL 1844791, at *9 (E.D. Va. Apr. 10, 2020) (noting elevated showing required for mandatory injunction rather than prohibitory injunction). Plaintiffs seek a mandatory injunction that would represent a stark interference not only with Virginia's upcoming electoral process, but also with its already completed election. And, as discussed below, the Supreme Court has consistently admonished such interference by the federal courts. Plaintiffs seek such an extreme remedy that it renders it unavailable.

Here, even affording Plaintiffs the assumption that they would prove the merits of their voter dilution claims, the remedy that Plaintiffs seek exceeds the limits of a federal court's power to interfere with a state's control over its elections. First, the Supreme Court in *Reynolds* stated

that "once a State's legislative apportionment scheme has been found to be unconstitutional," the

federal court should "insure that no further elections are conducted under the invalid plan." 377

U.S. at 585. Similarly, once a district court has insured that the unconstitutional districts in a

particular case have been remedied, its proper role in the districting process ends. *North

Carolina v. Covington*, 138 S. Ct. 2548, 2555 (2018); *Holloway v. City of Virginia Beach*, ___ F.

4th ___, 2022 WL 2961913, at *7 (4th Cir. 2022) (finding apportionment challenge moot when no

further elections would be held under challenged plan).  Plaintiffs have already obtained the

relief that cures the alleged unconstitutional districts, as Virginia will hold its next election under

the new maps in accordance with the process set forth in the Constitution of Virginia.   Va.

Const. art. II, § 6-A.  Thus, the Court's role in the process should end.

  Even if the Court could impose the new maps, such an imposition would go well beyond

the injury identified by Plaintiffs.  When faced with a finding that a state has unconstitutionally

drawn districts, federal courts must narrowly tailor the remedies that they impose. *White v.

Weiser*, 412 U.S. 783, 797 (1973) (holding that district court erred in failing to choose a court-

ordered plan that did not most closely approximate the state-proposed plan); *Whitcomb v.

Chavis*, 403 U.S. 124, 160-61 (1971) (holding that district court erred in rejecting certain districts

that it did not specifically find unconstitutional).  Indeed, a "district court's modifications of a

state plan are limited to those necessary to cure any constitutional or statutory defect." *Upham v.

Seamon*, 456 U.S. 37, 43 (1982) (finding that district court erred in redrawing districts not found

unconstitutional).

  The requirement that federal courts narrowly tailor their remedies manifests itself in the

proposition that a federal court redrawing districts should only redraw those districts that it finds

unconstitutional. *See Covington*, 138 S. Ct. at 2555 (finding that the district court erred in

redrawing districts that it had not found unconstitutional).  To the extent that redrawing unconstitutional districts will affect the boundaries of other districts, courts must redraw the districts to minimize the impacts on other districts.  *See Bethune-Hill I*, 368 F. Supp. 3d at 877 (minimizing the districts affected in redrawing the maps, because the Court's "role is a narrow one").

Even setting aside the dissolution of the House of Delegates, Plaintiffs' requested remedy — to hold an election on entirely new maps — would have the Court completely disregard this mandate that it narrowly tailor its remedy to the affected districts.  Plaintiffs have challenged three allegedly unconstitutional districts.  Yet, they request an election that would affect all 100 districts.  The Court cannot implement a remedy that affects all 100 districts while adhering to the Supreme Court's mandate to narrowly tailor a remedy to the allegedly unconstitutional districts.

The contrast between the remedy granted in the typical apportionment claim and a potentially narrowly tailored remedy here highlights the unavailability of the remedy that Plaintiffs seek.  In a normal apportionment claim, a state legislature draws a map using new census data.  Upon a successful challenge and a finding that the legislature has drawn certain illegal districts, the court (after giving the legislature an opportunity to remedy the defects) redraws the violative districts.  All districts are based on the same census data.  The state then conducts the next election for all districts under the new maps.  Even if the court orders a special election of the affected districts, both the affected districts and the unaffected districts are drawn using the same population data.  All legislators represent citizens in their districts based on the same census data.

32

Here, a narrowly tailored remedy would require the Court to redraw the three challenged districts (and those districts necessary to redraw the three challenged districts) and order a special election of those affected districts. But, under Plaintiffs' theory, the Court would redraw the affected districts using population data from the 2020 Census. All unaffected districts would still be based on population data from the 2010 Census. Thus, not all 100 districts would be based on the same population data. Redrawing the challenged districts would involve moving tens of thousands of citizens from Plaintiffs' districts into other districts. Unless the Court orders a special election of those districts, citizens could find themselves in a district that they did not vote in in 2021 and may not vote in again in 2023, essentially nullifying their previous vote and, from a practical standpoint, diminishing the strength that they have in petitioning their Delegate. A special election would occur in the middle of the Delegates' terms, mixing districts based on the 2010 Census with districts based on the 2020 Census. The Court fails to discern a feasible method of commuting the terms of only those Delegates in the affected districts and ordering a special election in those districts. Basing some districts on 2010 Census data and some on 2020 Census data, when an election on the 2010 Census has already occurred, simply cannot work. Thus, the only feasible remedy involves holding a special election using a new map with all 100 districts drawn from the same population data. But, as discussed above, the Court cannot order a remedy that affects all districts when Plaintiffs only challenge three.

### b.    *The allegations cannot support the Court ordering a special election.*

Even assuming that the Court has the authority to grant the special election of all 100 districts, these circumstances fall far short of the appropriate circumstances that the Supreme Court has indicated could warrant such an extreme remedy. In *Covington*, the Supreme Court vacated a district court's remedial order that ordered North Carolina's General Assembly to

redraw 28 unconstitutional districts, truncated the term of the legislators from two years to one

and ordered a special election. *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017). The

Court found that the district court had not conducted the proper analysis and remanded the case

to the district court. *Id.* at 1626. In doing so, it set forth what a court must consider in weighing

a request for such an extreme remedy:

> And in the context of deciding whether to truncate legislators' terms and order a
> special election, there is much for a court to weigh. Although this Court has
> never addressed whether or when a special election may be a proper remedy for a
> racial gerrymander, obvious considerations include the severity and nature of the
> particular constitutional violation, the extent of the likely disruption to the
> ordinary processes of governance if early elections are imposed, and the need to
> act with proper judicial restraint when intruding on state sovereignty.

*Id.* at 1625-26. On remand, the district court denied the plaintiffs' request for a special election,

because it would disrupt the ordinary processes of governance. *Covington v. North Carolina*,

270 F. Supp. 3d 881 (M.D.N.C. 2017).

The Court need not delve deeply into these factors to determine that they in no way

support the relief sought by Plaintiffs. Each factor will be addressed in turn.

### i.     *The severity of the violation and the disruption of the government*

Because the Court addresses these factors in the context of its standing analysis, it will

assume that Plaintiffs will prevail on the merits when assessing "the severity and nature of the

particular constitutional violation." *See Equity in Athletics*, 639 F.3d at 99 ("This court assumes

the merits of a dispute will be resolved in favor of the party invoking our jurisdiction in assessing

standing . . ."). However, a broad overview of the elements of the claims and Plaintiffs'

allegations demonstrate that Plaintiffs will struggle to prove a *severe* violation. Indeed, although

the Court assumes a violation of the Constitution or federal law for the purposes of this analysis,

it seems highly unlikely that such a violation even occurred *at all*.

First, with respect to the Equal Protection Clause claim, Plaintiffs "must show that the State has placed a burden upon the right to vote by intentionally establishing or maintaining devices or procedures that cause minority citizens to have less opportunity than other citizens to participate in the political processes and to elect legislators of their choice." *Bethune-Hill v. Va. State Bd. of Elecs.*, 141 F. Supp. 3d 505, 513 (E.D. Va. 2015), *aff'd in part, vacated in part*, 137 S. Ct. 788 (2017); *Daly*, 93 F.3d at 1222 (remanding to determine if the plaintiffs could produce "any credible evidence to establish that the apportionment plan at issue here was the product of bad faith, arbitrariness, or invidious discrimination."). Plaintiffs allege no such bad faith or invidious intent on the part of the state. Nor could they, given that a catastrophic event entirely out of Defendants' control, COVID-19, caused Virginia to conduct an election on the only map available to it — a map redrawn by this Court. Moreover, *Reynolds* and its progeny stand for the proposition that "reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *White*, 412 U.S. at 794-95 (quoting *Reynolds*, 377 U.S. at 586). Again, given that Virginia adopted new districts only four months after receiving the 2020 Census data, Plaintiffs will struggle to establish that Defendants violated the Constitution in holding an election that commenced before the state had the opportunity to reapportion the districts using the new data.

Likewise, the Court would not consider Plaintiffs' claims under the Voting Rights Act as demonstrating a severe violation. First, "[o]n its face, § 2 [of the VRA] does not apply to a court-ordered remedial redistricting plan." *Abrams v. Johnson*, 521 U.S. 74, 90 (1997). This makes sense, as Section 2 of the VRA applies to any "voting qualification or prerequisite to

voting or standard, practice, or procedure . . . *imposed or applied by any State or political subdivision. . . .*" 52 U.S.C. § 10301(a) (emphasis added). Thus, it remains an open question whether the VRA would even apply to these maps that the Court redrew. More importantly, however, Plaintiffs have not even attempted to plead facts supporting the elements of a claim under the VRA.[5] Instead, they simply restated their allegations supporting their Equal Protection Claim.

As to the second consideration, the likely disruption to the ordinary processes of governance, the Court notes that "any decision to order a special election will inevitably disrupt the ordinary processes of governance." *Covington*, 270 F. Supp. 3d at 901. As discussed in the examination of the *Purcell* principle below, dissolving the House of Delegates and declaring a new election will necessarily disrupt the ordinary process of governance.

### ii.   *Intrusion on the state's sovereignty and the Purcell principle*

With respect to the intrusion on the state's sovereignty, the Court finds that this factor weighs heavily against commuting the results of a previous election and ordering a special election. First, as discussed above, the broad remedy requested would go well beyond the jurisdiction of this Court. Second, it would contravene the Supreme Court's "repeated[] emphas[is] that federal courts ordinarily should not alter state election laws in the period close to

---

[5]      In bringing a claim under § 2 of the VRA, a plaintiff "must show three threshold conditions: first, the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; second, the minority group is politically cohesive; and third, the majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate." *Abrams*, 521 U.S. at 91 (cleaned up). Once the plaintiff establishes these three conditions, "the court considers whether, on the totality of the circumstances, minorities have been denied an equal opportunity to participate in the political process and to elect representatives of their choice." *Id.* (quoting 42 U.S.C. § 1973(b) (now 52 U.S.C. § 10301(a))).

an election." *Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 30 (2020)

(Kavanaugh, J., concurring in denial of application to vacate stay).

The Constitution places the principal responsibility for setting and holding elections with

the state legislatures. *See* U.S. Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of

holding Elections for Senators and Representatives, shall be prescribed in each State by the

Legislature thereof . . ."); *Growe v. Emison*, 507 U.S. 25, 34 (1993) (reiterating that "the

Constitution leaves with the States primary responsibility for apportionment of their federal

congressional and state legislative districts"). "Thus, the federal Constitution provides States —

not federal judges — the ability to choose among many permissible options when designing

elections." *Wise v. Circosta*, 978 F.3d 93, 99 (4th Cir. 2020) (quoting *Middleton v. Andino*, 976

F.3d 403, 404-05 (Mem.) (4th Cir. 2020) (Wilkinson and Agee, J.J., dissenting)). The federal

courts' deference to the states applies to redistricting as well, as the Supreme Court has "said on

many occasions: reapportionment is primarily the duty and responsibility of the State through its

legislature or other body, rather than of a federal court." *Growe*, 507 U.S. at 34.

This deference has given rise to the *Purcell* principle, wherein the Supreme Court "has

repeatedly stated that federal courts ordinarily should not enjoin a state's election laws in the

period close to an election." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (Mem.) (2022)

(Kavanaugh, J., concurring) (citing *Purcell*, 549 U.S. 1). The *Purcell* principle "reflects a

bedrock tenet of election law: When an election is close at hand, the rules of the road must be

clear and settled." *Id.* at 880-81. A plaintiff can overcome the *Purcell* principle "if a plaintiff

establishes at least the following:

     (i)     the underlying merits are entirely clearcut in favor of the plaintiff;

     (ii)    the plaintiff would suffer irreparable harm absent the injunction;

     (iii)   the plaintiff has not unduly delayed bringing the complaint to court; and,

     (iv)   the changes in question are at least feasible before the election without significant cost, confusion, or hardship."

*Id.* at 881.  Plaintiff cannot establish all four of these elements.

### *a.*    *The underlying merits and irreparable harm*

As to the first prong, again, because the Court considers this question in the context of assessing Plaintiff's standing, it will assume that Plaintiffs will succeed on the merits of their claims.  However, for the reasons discussed above, Plaintiffs cannot establish that the underlying merits "are entirely clearcut" in their favor.

With respect to the second *Purcell* factor, the Court finds that Plaintiffs may suffer only minimal irreparable harm, if any, if the Court refuses to dissolve the current House of Delegates.  First, any harm from the allegedly unconstitutional maps has an expiration date, as Virginia will hold its next elections under different maps.  And, Plaintiffs concede the constitutionality of the new maps.  (Am. Compl. ¶¶ 69, 71, 81.)  Thus, Plaintiffs can no longer claim any harm from the injury to their voting equality.  With respect to the injury to their representational equality, any harm will last only one session of the General Assembly, and could be ameliorated in subsequent terms.  Plaintiffs have not specified any particular difficulties that they have had or will have with petitioning their Delegates that arises from the alleged dilution of their representational strength.  Nor have they alleged any actions or inactions by the General Assembly that harmed them.  Indeed, Plaintiffs still have the ability to petition their respective Delegates.  Thus, Plaintiffs have not alleged the type of irreparable harm that would allow them to overcome the *Purcell* principle.

### b.    *Delay*

Third, to overcome the *Purcell* principle, Plaintiffs must establish that they have "not unduly delayed bringing the complaint to court." *Merill*, 142 S. Ct. at 881. Plaintiffs plainly fail this requirement.

Plaintiff Jeffrey Thomas, Jr. initiated this action by filing a Writ of Mandamus on June 8, 2022. (ECF No. 1.) By that time, the deadline for candidates to file qualification paperwork for the 2022 election had passed on April 7, 2022. (Stip. ¶ 40.) The statewide primaries for the 2022 elections occurred less than two weeks after Plaintiff filed his Writ of Mandamus, on June 21, 2022. (Stip. ¶ 41.) Absentee voting for the 2022 election must begin no later than September 24, 2022. *Goldman II*, 2022 WL 2024745, at *4. Yet, the 2020 Census data on which Plaintiff Jeffrey Thomas, Jr. based his Writ of Mandamus became available in August 2021. (Stip. ¶¶ 31-32.) Given the timeline for redistricting set forth in the Constitution of Virginia, Plaintiff Jeffrey Thomas, Jr., should have known that holding the 2021 election under new maps would not have been feasible, especially given that primaries and absentee voting had already begun under the 2011 maps. *Goldman II*, 2022 WL 2024745, at *3. Still, Plaintiff Jeffrey Thomas, Jr. waited almost ten months — well after the wheels of the 2022 election machinery had begun to turn — to file his lawsuit. Then, when the Court expedited consideration of his lawsuit, ordering Defendants to respond to his complaint on a truncated schedule, Plaintiff Jeffrey Thomas, Jr. delayed the matter further by filing an Amended Complaint. Such an action exhibits a lack of seriousness about obtaining expedited relief.

Plaintiffs Michelle Thomas and Thompson waited even longer than Plaintiff Jeffrey Thomas, Jr. They did not join this lawsuit until the filing of the Amended Complaint on June 16, 2022. (ECF No. 14.) They made no efforts to join the *Goldman* suit. Although they apparently

distributed a press release stating that they had written a letter to the Court to join the lawsuit (Defs.' Mem. at 5 n.1), the Court never received such a letter. In any event, the Court does not operate based on press releases or letters. Rather, requests for action from the Court must come in the form of a motion or a pleading. Fed. R. Civ. P. 7; Loc. R. Civ. P. 7. This applies to both *pro se* and represented parties. And, notably, "Plaintiff Thompson is an attorney" (Am. Compl. ¶ 47), giving Plaintiffs less of an excuse for failing to abide by the Rules.

The separate *Goldman* action does not excuse Plaintiffs' delay. The pendency of the *Goldman* suit in no way precluded Plaintiffs from filing their own suit. On October 15, 2021, Plaintiff Jeffrey Thomas, Jr. filed a Motion to Intervene in the *Goldman* suit (Goldman ECF No. 45), attaching a proposed complaint that closely resembles the pleadings that he ultimately filed in this case. However, within the next week, Defendants filed an interlocutory appeal of the partial denial of their motion to dismiss. (ECF No. 47.) As a result, the Court stayed the *Goldman* case, including Plaintiff Jeffrey Thomas, Jr.'s Motion to Intervene. (ECF No. 49.) Yet, the stay in no way precluded Plaintiffs from filing their own lawsuit at that time.[6] Plaintiff Jeffrey Thomas, Jr. seemed to understand this, as he later filed a Notice of Intent to File Separate Lawsuit. (ECF No. 71.) Instead, he waited over two months after filing that Notice before commencing the instant action.

In the same vein, both injuries and relief in reapportionment cases must be district-specific, furthering the need for Plaintiffs to file their own lawsuit to seek their own relief. *Compare Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) ("To the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific."); *with Upham v. Seamon*, 456

---

[6]    Plaintiff also had no reason to assume that the Court would grant his motion to intervene, as the Court had previously denied Stanfield's Motion to Intervene. (Goldman ECF No. 32.).

U.S. 37, 43 (1982) (implementing "modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect"), *and Covington*, 138 S. Ct. at 2555-56 (holding that the district court erred in redrawing districts other than the ones that it found unconstitutional). From a logistical and legal standpoint, Plaintiffs could — and should — have filed their own lawsuits many months earlier.

Of course, Plaintiffs do not bear all of the blame for the fact that the Court now decides this case well into the commencement of the 2022 election process. Defendants also shoulder some responsibility for how they litigated the *Goldman* action. Defendants engaged in inexcusable piecemeal litigation that prevented the Court from determining whether it had jurisdiction for almost a year. Although they raised standing in their motion to dismiss (Goldman ECF No. 13) Plaintiff Goldman's original complaint, they did so on grounds that differed from the standing argument that ultimately prevailed. Moreover, they abandoned their standing challenge in moving to dismiss Plaintiff Goldman's Second Amended Complaint. (Goldman ECF No. 24.)

On October 8, 2021, the Court *sua sponte* ordered Defendants to address several questions, including whether they intended to challenge Plaintiff Goldman's standing. (Goldman ECF No. 34.) In response, Defendants argued that Plaintiff Goldman lacked standing, but not because he resided in an underpopulated district. (Goldman ECF No. 38.) Even then, Defendants still did not move to dismiss the case for lack of standing. Instead, during the October 12, 2021 hearing on their motion to dismiss, the Court again raised that issue of standing, noting its serious concerns about Plaintiff Goldman's standing. (Tr. of Oct. 12 Hr'g (Goldman ECF No. 43) at 4:9-11.) Counsel for Defendants then attempted to raise an oral motion on standing. (Tr. of Oct. 12 Hr'g at 20:12-14.) Rather than ruling on this important issue

41

without briefing, the Court set a briefing schedule for Defendants to file a motion to dismiss on standing and scheduled oral argument on that motion.  (Tr. of Oct. 12 Hr'g at 32-33, 37:11-15; ECF No. 41.)  Defendants then asked for 48 hours to decide whether to file a notice of appeal of the denial of the sovereign immunity motion to dismiss, but the Court gave them six days.  (Tr. of Oct. 12 Hr'g at 34:16; 36:4-6.).  Defendants requested that, if they decided to appeal, the Court would stay the case before the deadline for them to file their motion to dismiss.  (Tr. of Oct. 12 Hr'g at 37:25-38:2.)

Instead of moving to dismiss based on standing or allowing the Court to address the issue during the hearing that it had scheduled for November 8, 2021, Defendants filed a notice of appeal.  (ECF No. 47.)  Because of the interlocutory appeal, the Court then stayed the *Goldman* action, as Defendants requested.  (ECF No. 49.)  Then, on appeal, Defendants challenged Goldman's standing despite not allowing this Court to address the issue in the first instance.  Nor did Defendants move the Fourth Circuit to remand the case to this Court to address standing, leaving the Fourth Circuit with no record to review their standing challenge.  (Br. of Appellants at 25-30, *Goldman v. Brink*, Case No. 21-2180 (4th Cir.) (ECF No. 10).)

Apparently recognizing the lingering standing concerns with the case, the Fourth Circuit only addressed Goldman's standing during oral argument on March 8, 2022.  Thereafter, on March 15, 2022, the Fourth Circuit remanded the case to this Court to resolve the standing question.  (Goldman ECF No. 60.)  The Court set an expedited briefing schedule and, ultimately, on June 6, 2022, dismissed Goldman's case for lack of standing.  (ECF Nos. 69, 89.)  Because the Court lacked subject matter jurisdiction over the *Goldman* action, there existed no case into which Plaintiff Jeffrey Thomas, Jr. could intervene.  Consequently, the Court denied his motion to intervene as moot.  (ECF No. 89.)

42

Thus, Defendants' indefensible piecemeal litigation strategy — including and especially the appeal that they noticed but then argued that the Fourth Circuit should remand due to Plaintiff Goldman's lack of standing — significantly delayed the resolution of the *Goldman* action. Had Defendants properly raised Goldman's standing in their motion to dismiss the second amended complaint, the Court likely would have dismissed the *Goldman* case at approximately the same time that it ruled on their sovereign immunity challenge — October 12, 2021. Defendants had available to them sufficient facts and law to adequately address the standing issue when they moved to dismiss the second amended complaint, giving them no excuse not to do so. Indeed, Rule 12 of the Federal Rules of Civil Procedure required that they raise it in that motion. But, they failed to do so and instead pursued a misguided strategy of piecemeal litigation. As a result, Defendants delayed the resolution of the *Goldman* case by eight months.

The Court admonishes the Attorney General's Office for engaging in such piecemeal litigation that delayed resolution of such important matters. The Court expects more from the Attorney General's Office, given that it represents the citizens of Virginia. *See Terry v. Wilder*, 29 Va. Cir. 418, 1992 WL 885093, at *9 (Va. Cir. Ct. 1992) ("The Attorney General's responsibility is not limited to serving or representing the particular interests of State agencies, including opposing state agencies, but embraces serving or representing the broader interests of the State."). It should seek the speedy and just resolution of disputes affecting the citizens of Virginia, especially those related to the election of Virginia's representatives. Although the Court does not believe that the Attorney General's Office engaged in any bad faith efforts to stall

the litigation, it still finds the litigation conduct unacceptable, and cautions that any such piecemeal litigation in the future will not be tolerated.[7]

Nevertheless, regardless of the Attorney General Office's deleterious litigation conduct in the *Goldman* action, Plaintiffs here remained free to file their own lawsuit throughout the pendency of the *Goldman* case. Their refusal to do so forecloses their ability to overcome the *Purcell* principle. Although both parties bear responsibility for the litigation delay to this point, neither party bears responsibility for the delay that ultimately drives the Court's decision today — the COVID-induced delay of the 2020 Census data.

### c.   *Feasibility of changes*

The fourth prong of the *Purcell* analysis requires Plaintiffs to establish that "the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Merrill*, 142 S. Ct. at 881. The Supreme Court has recognized that "[r]unning elections state-wide is extraordinarily complicated and difficult," demanding "substantial time to plan" on the part of state and local election officials. *Id.* at 880.

Here, the qualification paperwork deadlines and the primaries for the 2022 election have already passed. (Stip. ¶¶ 40-41.) Absentee voting begins in less than two months. *Goldman II*, 2022 WL 2024745, at *4. Declaring a new election now would require candidates to collect signatures and submit qualifying paperwork to the election officials. These officials would then need to review the paperwork, hold primaries and prepare for the general election in less than two months' time. These efforts "require enormous advance preparations by state and local officials, and pose significant logistical challenges." *Merrill*, 142 S. Ct. at 880.

---

[7]   In fairness to current counsel for Defendants, the mishandling of this case occurred during the administration of the previous Attorney General, Mark R. Herring, who was defeated in the 2021 election.

44

The Supreme Court has regularly found that federal court injunctions that allowed for significantly more time before the election violated the *Purcell* principle. For example, in *Merrill v. Milligan*, the Supreme Court stayed a district court's preliminary injunction ordering a state to redraw districts, even though the primaries would not start for another two months. 142 S. Ct. at 880; *see, e.g., Moore v. Harper*, 142 S. Ct. 1089, 1089 (2022) (Kavanaugh, J., concurring) (denying a stay in March that would have required the state to change its districts for the upcoming 2022 elections, because the elections were too close to warrant judicial interference); *see also Wise v. Circosta*, 978 F.3d 83, 98 (4th Cir. 2020) (applying the *Purcell* principle in rejecting application for an injunction). Here, Plaintiffs seek to declare a new election well after the timeframe that the state has deemed reasonable to begin the election process, rendering their request even farther outside the bounds allowed under the *Purcell* principle. Plaintiffs argue that the state can accomplish this, because they recently declared and held a special election in just a month. (Pls.' Resp. at 5-6.) Yet, as Defendants respond, this example provides little support for the notion that a state could comply with a court order to hold 100 special elections on new districts across the entire state in essentially the same timeframe. (Defs.' Reply at 10.) Such a task would require a herculean effort at the local and state levels on an incredibly tight time frame.

Accordingly, because Plaintiffs have not alleged a severe violation, and ordering a special election would severely intrude on the Commonwealth's sovereignty and disrupt the ordinary processes of governance, the Court finds that it could not order the extraordinary relief sought by Plaintiffs. Although ordering a special election is theoretically possible, the remedy sought "must be something more than an ingenious academic exercise in the conceivable." *Students Challenging Regul. Agency Procs.*, 412 U.S. at 688. The circumstances presented here — a

45

global pandemic causing a single additional election for one chamber of the General Assembly under Court-approved maps that were the only maps available in time for the election— falls far afield of any circumstances that could warrant the relief sought by Plaintiffs, rendering it unavailable. This is especially true, given that the Supreme Court of Virginia promptly drew maps based on the latest census data by December 2021, and the next House of Delegates election takes place next year, which will remedy the injuries that Plaintiffs claim. Thus, the Court cannot furnish Plaintiffs the relief that they seek, and their claims to standing fail for lack of redressability.

Finally, Plaintiffs argue that the Court must remedy the vote dilution that they have suffered, because the elected Delegates refuse to do so. (Am. Compl. at 16.) However, the "[f]ailure of political will does not justify unconstitutional remedies." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). The Court will not resort to an unconstitutional intrusion on Virginia's authority to set the parameters of the election and terms of its Delegates.

### B. *Cosner* Does Not Aid Plaintiffs.

Plaintiffs' persistent invocation of *Cosner v. Dalton*, 522 F. Supp. 350 (E.D. Va. 1981) does not help them. There, the plaintiffs challenged maps enacted by the General Assembly on August 11, 1981. *Id.* at 354-55. The Court found that the maps violated the Equal Protection Clause. *Id.* at 361. The Court noted that "[a]ny remedy must, of course, be considered in light of the imminence of the 1981 elections." *Id.* at 363.[8] The primary elections were scheduled for September 8 and the general election for November 3. *Id.* The Court determined that devising a new court-ordered plan would consume too much time and delay the November elections. *Id.* Adopting one of the parties' proposed plans would have "require[d] a drastic change in voting

---

[8]     The Court issued its decision on August 25, 1981.

mechanics, also delaying the elections." *Id.* The Court determined that holding an election on any day other than November 3, the date scheduled for the election of the Governor, would depress turnout. *Id.* Further, holding the election on the 1971 lines would result in voter dilution in other areas due to uneven population growth. *Id.*

Because the Court determined that the state legislature should have the opportunity to redraw the plan, and it could not do so by November 3, it ordered the General Assembly to redraw the plan by February 1, 1982. *Id.* at 364. It selected this date, because "a later date will interfere with the State's general election schedule." *Id.* Thus, to ensure that Virginians could vote "as soon as possible for their representatives under a constitutional apportionment plan," the Court limited the terms of the Delegates elected in the *upcoming* November 3 election to one year and set a new election for the House of Delegates to occur on the same day as the 1982 general election. *Id.*

The differences in the facts in *Cosner* and those presented here demonstrate why Plaintiffs cannot obtain the relief that they seek. First, the election in *Cosner* had not yet occurred. Therefore, voters in the 1981 primaries and general election knew the elected Delegates would only serve one-year terms. Here, voters elected the Delegates in 2021 to serve two-year terms, but Plaintiffs would have the Court shorten those terms after the election. Indeed, Plaintiffs' proposed remedy would have the effect of dissolving the House of Delegates halfway through its term. Because the *Cosner* Court issued its ruling in advance of the primaries and the general election, and the voters knew precisely the terms that the Delegates would serve, the remedy in *Cosner* in no way had the effect of dissolving the House of Delegates. Thus, the Court in *Cosner* imposed a much less drastic remedy than what Plaintiffs seek here.

47

Moreover, although the Court decided *Cosner* before the Supreme Court decided *Purcell*, the *Cosner* Court essentially embraced the logic underpinning the *Purcell* principle. Specifically, the *Cosner* Court noted "[a]ny remedy must . . . be considered in light of the imminence of the 1981 elections." *Id.* at 363. Further, the Court found a remedy unacceptable that interfered with an approaching election and would require "a drastic change in voting mechanics" that may delay the election. *Id.* at 363. Moreover, the Court recognized that implementing a new map later than February 1 of an election year would unacceptably "interfere with the State's general election schedule." *Id.* at 364. Thus, both the similarities and differences between this case and *Cosner* further demonstrate that the remedy that Plaintiffs seek is not available to them.

## IV. CONCLUSION

Most voting rights claims involve an elected state legislature intentionally drawing districts to disadvantage a racial minority or political group. Even then, federal courts narrowly cabin their interference out of respect for the Constitution's grant of authority over elections to the states. Courts redraw only the affected districts for use in the next scheduled election. Only the most invidious violations warrant even considering the extreme federal court interference of dissolving an elected state legislature and ordering a new statewide election. Yet, Plaintiffs seek that extreme relief here.

The facts of this case fall far short of even the normal voting rights cases. The global pandemic delayed the reapportionment process, just as it disrupted nearly every aspect of American life. As a result of this disruption, and through no fault of Defendants, Virginia held an election using districts previously redrawn by this Court. And, it will hold the next election using different maps drawn by the Supreme Court of Virginia in accord with the Constitution of

Virginia.  Here, Plaintiffs do not (and cannot) attack the decisions of a legislature (or any state actor) in drawing the maps.  Accordingly, this federal court cannot usurp the authority that the Constitution grants Virginia over its elections and, therefore, cannot grant the relief requested by Plaintiffs.  At bottom, Plaintiffs claim an injury that Defendants did not cause and that the Court cannot redress.  Accordingly, Plaintiffs lack standing to bring these claims, and the Court lacks subject matter jurisdiction to adjudicate them.

Consequently, the Court will GRANT Defendants' Motion to Dismiss (ECF No. 24) and DISMISS WITHOUT PREJUDICE this case.[9]

An appropriate Order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record and *pro se* Plaintiffs.

_____/s/_____

David J. Novak
United States District Judge,

Richmond, Virginia
Date: _August 1, 2022_

---

[9]    Because this Court lacks subject matter jurisdiction, it will not address Defendants' merits arguments in the motion. *See Whitaker v. Monroe Staffing Servs., LLC*, __ F.4th __, 2022 WL 2898644 (4th Cir. July 22, 2022) ("Generally, a court must resolve jurisdictional issues before considering the merits of a claim, because without jurisdiction the court cannot proceed at all in any cause.") (cleaned up).